(566 P 2d 775)
No. 48,293

D. L. SOMERS, *Appellee,* v. HARRIS TRUST AND SAVINGS BANK, Trustee for L. B. Stableford, Deceased, *Appellant.*

Opinion filed June 10, 1977.

*Bert R. Hopper,* of Hopper, Fuqua and Hopper, of Wichita, for the appellant.

*Stanley Krysl,* of Hindman and Krysl, of Stockton, for the appellee.

Before HARMAN, C.J., REES and SWINEHART, JJ.

HARMAN, C.J.: This is an action by a subsequent lessee against a prior lessee of the north eighty acres of a 160 acre oil and gas lease. The plaintiff sought cancellation of the defendant's lease and quieting of the leasehold interest in himself. The case was submitted to the trial court upon an agreed statement of facts. The whole concern is the effect of unitization of the south eighty acres of defendant's leasehold acreage and production elsewhere within the unit. The trial court granted the requested relief and defendant has appealed.

The lease interest at issue here is the west half of the northeast quarter of section sixteen, township one, range eighteen, in Phillips county, Kansas.

On November 26, 1949, the mineral owners of the west half of the east half of section sixteen executed an oil and gas lease covering that land for ten years and so long thereafter as oil or gas was produced from the land by the lessee. The lease contained no entirety or unitization clause. By assignments L. B. Stableford, now deceased, became the owner of that lease on March 28, 1951. The action is now defended by his trustee, Harris Trust and Savings Bank. A producing well on the south half of the tract was developed in 1951. This was the only producing well on the 160 acre tract and it was plugged December 9, 1970. There have been no further operations on the land.

Meanwhile, on August 1, 1959, the mineral owners and the

leasehold owners unitized twenty-five different tracts in the Huffstutter Field into one production unit. The south half of the land covered by the 1949 lease was included in the unit. The north half was not. By 1970 all the mineral owners under the 1949 lease had ratified the unitization agreement. After the December 9, 1970, plugging of the well on the south eighty acres in the 1949 lease, the mineral owners continued to receive royalties from the unit notwithstanding the fact there was no production on their land. Production within the unit has been continuous.

On or about May 20, 1974, the mineral owners executed new leases on the west half of the northeast quarter to D. L. Somers, who thereafter instituted this suit. Most of the leases provided that they were to be null and void if the lands were in fact covered by a prior lease. Somers knew of the 1949 leases and the invalidity clauses were inserted in his leases for the protection of the mineral owners. The mineral owners at no time have made demand for further development under the original lease or for its release. Thus this contest is one to determine which lease is valid and which lessee may go ahead with development of the north eighty acres, each party being desirous of doing so. Plaintiff's theory has been and is that for want of production defendant's lease had terminated under the terms of the habendum clause.

In its order granting cancellation of defendant's lease the trial court announced the following as conclusions of law upon which it relied:

"1. It is noted the unit agreement provided that the unit area could be enlarged by the operator's committee to include tract or tracts in addition to those shown in Exhibit A and described in Exhibit B provided that all of the working interest owners and royalty owners of such additional tract or tracts entered into this agreement. The Court concludes this to be an additional reason for finding that the West half Northeast Quarter of Section 16-1-18 was in fact severed from the unit agreement.

"2. The Court further finds the duty to drill an offset well or wells is not prolonged or extended as to an area that is purported to be covered by a unitization agreement, but yet does not derive any distribution of oil whatever from the unitized area.

"3. When the production ceased on the W/2 E/2 of 16-1-18, then the lease dated November 26, 1949, recorded in Book 123, pages 345-7, expired in accordance with its terms insofar as said lease covered the W/2 NE/4 of 16-1-18, Phillips County, Kansas, and should be canceled of record by the Court."

We should first examine the unitization agreement. Its preamble recites the decline of natural pressure in the Lansing-Kansas

City formation under the tracts and the more efficient use of secondary recovery methods if the tracts were operated as a unit. Attached to the agreement are two exhibits: Exhibit A, being a map outlining both the unit area and the participating area, and exhibit B, being a list of the descriptions of participating tracts, their owners and the percentage of tract participation in the unit production.

Article I, the definition provision of the agreement, states:

"(a) 'Unit Area' shall be those formations underlying each of 25 tracts described in Exhibit 'B' and outlined in red on the plat marked Exhibit 'A', attached hereto.  .  .  .

"(h) 'Tract' is a parcel of land within the unit area set apart for the purpose of assigning to it a tract factor."

### Article II, the unitization provision, states:

"2.  The rights of the several working interest owners to search for and produce unitized substances from each tract of land in the unit area and the rights of the several royalty owners in and to the tracts comprising the unit area are hereby unitized and pooled into one unit, all to the same extent as if the unit area had been included in a single lease by all the royalty owners, as lessors, in favor of all the working interest owners, as lessees, subject to all the terms and conditions of this agreement.

"3.  The production of unitized substances from the unit area through any well or wells shall be considered for all purposes as production of oil and gas from the land covered and affected by each oil and gas lease affecting any of the land within the unit area and production from any part of said unit area shall perpetuate all oil and gas leases whether or not the lands covered by any particular such oil and gas lease are productive or non-productive. No person executing or ratifying this agreement shall have any right either in law or equity to cancel any oil and gas lease covering any part of the land contained in the unit area. Each of said leases shall remain in full force and effect for all purposes so long as unitized substances are produced from any well producing from the unit area."

Article III, paragraph 9, provides that the unit area may be enlarged by the operators' committee to include tracts other than those described in exhibit B and shown in exhibit A, provided that all of the working interest owners and the royalty owners of such additional tracts agree, the participating percentage of all to be adjusted accordingly.

Article VI, paragraph 18, provides:

"The unit area shall be developed and operated as a unit without reference to separate ownership of the tracts or interests therein within the unit area. Working interest owners shall have no obligation to offset any well or wells drilled on any of the tracts within the unit area nor to set separate tanks or measure separately the production from the respective tanks."

The problem appears to be this: A leases 160 acres to B. Later the parties place eighty acres of the leased land into a unit. A producing well is brought in within the unit but not on A's included acres. Does such production extend the lease beyond its primary term as to A's eighty acres not within the unit?

We have no Kansas authority squarely in point. The majority rule elsewhere is that where a portion of an oil and gas lease is committed to a unit, production anywhere in the unit extends the term of the entire lease (2 Summers, Oil and Gas, Sec. 302.1, pp. 293-294; Rebman, *"Continuation of the Oil and Gas Lease on Outside Acreage by Production Within the Unit"*, 35 Tex. L. Rev. 833 [1957]). The rule is based on conservation and public policy. Its rationale starts with the proposition that an oil and gas reservoir does not abide by man-made boundaries (K.S.A. 55-1302 defines a "pool" as ". . . an underground accumulation of oil and gas in a single and separate natural reservoir characterized by a single pressure system so that production from one part of the pool affects the reservoir pressure throughout its extent. . . ."); because of the nature of the oil and gas pool and because of the growing need for conservation drilling units were established; the units were tracts of sufficient size and shape that one well properly located could sufficiently drain the oil and gas therefrom; unitization makes possible the exploitation which would be possible if the land or subsurface rights were in single ownership; reservoir energy and contents and physical equipment are not wasted; since unit operations provide an efficient and less expensive method of oil and gas recovery allowing lease termination as to outside acreage would discourage operators from unitizing appropriate acreage (1 Myers, The Law of Pooling and Unitization, 2d ed., Sec. 3.02, p. 73; Merrill, *"Unitization Problems: The Position of the Lessor"*, 1 Okla. L. Rev. 119 [1948]).

Cases espousing the majority rule include *Scott v. Pure Oil Co.,* 194 F.2d 393 (5 CA, Tex.); *Buchanan v. Sinclair Oil & Gas Company,* 218 F.2d 436 (5 CA, Tex.); *Gray v. Cameron,* 218 Ark. 142, 234 S.W.2d 769; *Hunter Co. v. Shell Oil Co.,* 211 La. 893, 31 So.2d 10; *LeBlanc v. Danciger Oil & Refining Co.,* 218 La. 463, 49 So.2d 855; *Godfrey v. McArthur,* 186 Okla. 144, 96 P.2d 322; *Kunc v. Harper-Turner Oil Company,* 297 P.2d 371 (Okla. 1956); *Trawick v. Castleberry,* 275 P.2d 292 (Okla. 1953); *Whitaker v.*

*Texaco, Inc.,* 283 F.2d 169 (10 CA, Okla.); and *Clovis v. Pacific Corp.,* 140 Colo. 552, 345 P.2d 729. The only case to the contrary appears to be *Texas Gulf Producing Co. v. Griffith,* 218 Miss. 109, 65 So.2d 447, in which the court declared that to hold otherwise would apply conservation laws in violation of the constitutional guaranty that no person shall be deprived of his property without due process of law.

Although he acknowledges that it is not a "cow" case, plaintiff says certain principles announced in *Smith v. Home Royalty Association, Inc.,* 209 Kan. 609, 498 P.2d 98, are applicable here. In *Smith* the principal holding was summarized as follows:

"Where owner conveys a mineral interest which was to remain in force twenty-one years and as long thereafter as minerals are produced, and subsequently, successive owner and grantee of mineral interest separately execute lease permitting unitization, gas produced from other land in the unitized area does not fulfill the requirement in the deed that minerals be produced from said lands." (Syl. 1.)

The court was persuaded to this conclusion by its prior rulings in *Dewell v. Federal Land Bank,* 191 Kan. 258, 380 P.2d 379, and *Stratmann v. Stratmann,* 204 Kan. 658, 465 P.2d 938. In each of these cases the issue involved ownership of reserved mineral interests which after primary terms were dependent upon continued production from the land. In *Dewell* the court simply held:

"A reservation in a warranty deed, excepting and reserving an undivided one-half interest in minerals for a term of twenty years and so long thereafter as oil and gas or other minerals are produced therefrom or the premises are being developed or operated, creates a base or determinable fee in the minerals, and the reservation is not extended beyond the primary term by the lessee's payment of shut-in royalty." (Syl.)

However, *Dewell* does state that which appears to be the rationale for *Smith:*

" . . . [T]he conveyance or reservation of minerals in place by deed for a primary term and so long thereafter as oil or gas is produced or the premises are being developed creates a base or determinable fee. [p. 260.]

. . . . . . . . . . . . .

"The owner of a defeasance mineral interest cannot change the conditions by which the interest is to continue beyond the primary term, by any provision in an oil and gas lease to which the landowner is not a party." (p. 263.)

In *Stratmann* the court pointed up the fact it was dealing with a mineral interest, a present ownership in real property, rather than

"royalty interest", which is personal property when there is production. This appears to be of importance for present purposes only in connection with the ruling in *Smith,* in which the court emphasized it was dealing with a rule of real property established in Kansas which requires that extensions of a term be limited by the language of the original instrument and nothing else.

The heart of the unitization agreement here is paragraph 3 of Article II. It is in very broad terms: "The production of unitized substances from the unit area through any well or wells shall be considered for all purposes as production of oil and gas from the land covered and affected by each oil and gas lease affecting any of the land within the unit area and production from any part of said unit area shall perpetuate all oil and gas leases whether or not the lands covered by any particular such oil and gas lease are productive or non-productive." Production within the unit is to be considered for all purposes as production from the land covered and *affected* by the lease. Additionally plaintiff's grantors were parties to the unitization agreement. This seems to take the case out of the ambit of the holding in *Smith.*

The majority rule already mentioned seems reasonable and just under the circumstances and one which should be adopted particularly where, as here, all affected parties have agreed to the unitization. The lease proviso for enlargement of the unit in event of agreement by all parties, including the lessors, is not inconsistent with its application. Plaintiff argues it would be inequitable to permit defendant to hold its lease on the north eighty after having done nothing on it for such a long period of time. It must be borne in mind this is not a suit by the lessors for violation of implied covenants in the lease where a multitude of factors may be involved. It is well established that the lessee's obligation of reasonable development and protection against drainage remains as to the outside acreage. These implied covenants continue to exist for the lessor's protection as to lease acreage outside the unit (See Rebman, supra, pp. 838-840, and 1 Myers, supra, Sec. 14.02 [7], pp. 496-498). In *Clovis v. Pacific Corp.,* supra, the court said this on the subject:

"Plaintiffs contend that by the adoption of this rule defendants can from now on retain the non-unitized lands doing nothing with them in the future to plaintiffs' detriment. This of course is not so. The rationale of the majority rule is recognition by the courts that the implied covenants for reasonable development and protec-

tion against drainage apply to leased lands outside of pooled units such as those held by defendants. These covenants are deemed by the courts to be sufficient remedies to compel lessees to protect the lessors' other lands from drainage and to proceed with their reasonable development in due course. We add that these covenants exist independent of the primary term and continue to protect the outside acreage. The covenant to develop requires the lessee to develop all of the lease as would any ordinary prudent operator. These plaintiffs have a remedy for a breach of this covenant if it occurs, which remedy could consist of either a cancellation of that part of the lease, for damages, or for both. [Citations.]

"The minority rule urged by plaintiffs, and which we decline to follow, in our view fails to consider the applicability of the implied covenant of reasonable development to the type of situation before us.  .  .  ." (p. 556.)

We hold production within the unit, although not on the eighty acres in the unit, extended the 1949 lease beyond its primary term as to that acreage and that lease has not expired. Accordingly the judgment is reversed.