AKANDAS, INC.; EDGAR A. BEECHER, for himself and as Executive Trustee of the Edgar A. Beecher Revocable Living Trust; CLARA A. BEECHER; MARTHA JANE BUNDY; O. R. CHAPMAN; URA LOUISE GLAMSER; MARDELL S. PRINGLE; and BOBBY EUGENE and MARJORIE L. SHOCKLEY, *Plaintiffs-Appellants*, v. B. W. KLIPPEL, a/k/a B. W. KLIPPEL, JR., and SUZANNE MASON KLIPPEL, *Defendants-Appellees*, and JAMES W. HEINTZ; BP2, A Colorado Corporation, d/b/a CARRINGTON OIL; LEWIS C. LONG and THOMAS A. LONG, d/b/a LONG DRILLING CO.; UNION CENTRAL LIFE INSURANCE COMPANY; AYLWARD TRUST ESTATE NO. 2; DUANE JESSUP, Attorney in Fact, AYLWARD TRUST ESTATE NO. 2; MASON WALKER KLIPPEL and BERNHARDT WILLIAM KLIPPEL, III, as tenants by the entirety; MASON WALKER KLIPPEL; BERNHARDT WILLIAM KLIPPEL, III; MARY FRANCES COMLEY; BETTY J. DECOURSEY; MRS. MARVIN E. JOHNSTON; MARVIN E. JOHNSTON; BETTY LOU LATIMER; D. C. MCCUNE and CHARLES E. HENSHALL, Trustees; VAIL A. VAN NATTA; MARY JEAN FINK, as Attorney in Fact for the heirs of ADA W. APT; WILLIS GLEN APT; MARY JEAN FINK; CHRISTINE LORRIE APT EPLING; SHARMAN JEAN APT RUSSELL; JAMES R. MATTHEWS; ROBERT R. LEE; ALAN D. O'NEIL; CYNTHIA O'NEIL; JACK KAYES; BARRY M. KAYES; and BETTY JEAN HESSE, *Defendants*.

(827 P.2d 37)

Opinion filed February 28, 1992.

*David E. Pierce*, of counsel, Shughart Thomson & Kilroy, P.C., of Overland Park, argued the cause, and *Gary A. Nelson*, of Murray, Tillotson & Nelson, Chartered, of Leavenworth, was with him on the brief for appellants.

*John G. Pike*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Dale L. Pohl*, of Forbes & Pohl, of Eureka, was on the brief for appellees B. W. Klippel, a/k/a B. W. Klippel, Jr., and Suzanne Mason Klippel.

The opinion of the court was delivered by

ABBOTT, J.: The plaintiffs sought judgment that certain oil and gas leases had expired. The resolution of that issue depends upon the interpretation of a document entitled "Unitization Agreement."

The plaintiffs and their predecessors in interest are mineral interest owners who entered into oil and gas leases. Each lease contains a habendum clause, specifying an initial or primary term ranging from one month to five years and a secondary term for "as long thereafter as oil or gas, or either, is produced from said land" or words to that effect. None of the leases specifically provides for entering into a unitization agreement.

In 1975 the plaintiffs entered into an agreement with B.W. Klippel, Jr., and Susan Mason Klippel (the Klippels). The agreement will be referred to as the Klippel Agreement. The Klippel Agreement assembled 12 separate tracts of land, incorporating 13 leases, into a block of acreage covering 1,520 acres. This agreement is entitled "Unitization Agreement—Buffalo Oil and Gas Field—Woodson and Wilson Counties, Kansas." Prior to entering into the Klippel Agreement, the land covered by the individual leases was in production. After the Klippel Agreement was executed, production continued on some, but not all, of the land covered by the individual leases. All leaseholders allowed the leases to operate as a unit and shared in the royalties from production, at least until this lawsuit was filed.

The plaintiffs and the defendants both filed motions for partial summary judgment. The parties all contend the agreement is unambiguous. The trial court granted the defendants' motion,

"finding that the Unitization Agreement, Buffalo Oil and Gas Field is in fact a pooling or unitizing agreement, and as such, will keep all the underlying leases in force so long as production continues on any one of the unitized leases."

The agreement reads, in pertinent part:

### "UNITIZATION AGREEMENT
### BUFFALO OIL AND GAS FIELD
### WOODSON AND WILSON COUNTIES, KANSAS

"WHEREAS, certain oil and gas leases encompass all, or substantially all, of the commercially productive oil and gas reservoir area underlying the Buffalo Oil and Gas Field, Woodson and Wilson Counties, Kansas; and,

"WHEREAS, these leases, collectively known hereinafter as the 'Buffalo Field Unit', are described and located as follows:

[Descriptions omitted.]

"WHEREAS, for the purposes of this agreement, it is agreed, by and between the parties hereto, that the following abbreviations shall be adopted and used:

| | |
|---|---|
| RI | Royalty Interest, |
| ORRI | Overriding Royalty Interest, |
| WI | Working Interest; and, |

"WHEREAS, as at the effective date of this agreement, ownership of the mineral interests in and to the aforesaid oil and gas leases is as follows:

Ray C. Martin, et al, lease:

| | | |
|---|---|---|
| .062500000 | RI | Union Central Life Insurance Company, |
| .062500000 | RI | Mardell S. Pringle, |
| .054687500 | ORRI | Mardell S. Pringle, |
| .820312500 | WI | B. W. Klippel, Jr., et ux; |

[Remaining lease interests omitted.]

"WHEREAS, each of the several leases set forth above represents a certain proportion of the oil and gas reserves yet to be commercially recovered from the oil and gas reservoir area underlying said Buffalo Field Unit, said proportions being as follows:

| | |
|---|---|
| Ray C. Martin, et al, lease | 5.223798 |
| S. G. Apt, et ux, lease | 26.530550 |
| D. N. Johnston, et ux, lease | 11.873867 |
| Minnie E. Brock lease | 1.650002 |
| Oley G. Apt, et ux, lease | 13.581116 |
| L. M. Clark, et al, lease | 10.047073 |
| J. S. Wilson, et ux, lease | 6.376907 |
| Milo Foster, et al, lease | 10.006452 |
| W. E. McGill, et al, lease | 5.877062 |
| H. C. Glamser, et ux, lease | 5.348474 |
| Fred A. Whitney, et ux, lease | 2.234323 |

Andrew Erickson, et ux, lease              1.250376

100.000000; and,

"WHEREAS, based upon and as determined by the above, ownership of the several mineral interests in and to the aforesaid Buffalo Field Unit is as follows, to-wit:

Of the total oil and gas production from the Buffalo Field Unit, ownership of, and payment for, all Royalty Interest shall be as follows:

| | |
|---|---|
| Union Central Life Insurance Company | .32648737 |
| Mardell S. Pringle | .32648737 |
| Ada W. Apt | 5.01395825 |
| Betty Lou Latimer | .49474445 |
| Vail A. Van Natta | .49474445 |
| Martha Jane Bundy | .49474445 |
| Edgar A. Beecher, et ux | .20625028 |
| Bobby Eugene Shockley, et ux | 3.24132337 |
| O. R. Chapman, et ux | .79711338 |
| Ura Louise Glamser | .66855925 |
| Noel P. McGregor, et ux | .43558738 |
| | 12.50000000 |

"Of the total oil and gas production from the Buffalo Field Unit, ownership of, and payment for, all Overriding Royalty Interest shall be as follows:

| | |
|---|---|
| Mardell S. Pringle | .28567645 |
| Aylward Trust Estate No. 2 | 2.27196832 |
| Marvin E. Johnston | .06015632 |
| Mary Frances Comley | .13736228 |
| Betty J. De Coursey | .13736228 |
| | 2.89252565 |

"Of the total oil and gas production from the Buffalo Field Unit, ownership of, and payment for, all Working Interest shall be as follows:

| | |
|---|---|
| B. W. Klippel, Jr., ex ux | 84.69747435 [sic] |
| | 84.60747435 |
| Total mineral interests, Buffalo Field Unit | 100.00000000 |

and,

"WHEREAS, it is recognized by all of the parties hereto that oil and gas production from the Buffalo Field Unit has reached a low economic level; that the value of the estimated additional recovery of oil and gas resulting from unitization exceeds the cost of the unitization program provided for herewith; that the proposed unit operations are fair and equitable to all interest owners; that the commercially productive oil and gas reservoir area underlying the Buffalo Field Unit constitutes a common source of supply; that unitization and the production methods to be utilized under such a plan of operation provide greater protection for the general health of the public and for the preservation of the environment; and that the unitized management, operation and further development of the Buffalo Field Unit is economically feasible and reasonably necessary to prevent waste within

the reservoir area and thereby increase substantially the ultimate recovery of oil and gas; and,

"WHEREAS, the effective time and date of the unitization provided for herewith shall be at 7:00 o'clock, A.M., C.D.S.T., on Tuesday morning, July 1, 1975; and,

"WHEREAS, in executing this Unitization Agreement, as provided for here-inbelow, the undersigned, unless excepted, warrant that they are the owners of the percentage interests set opposite their respective names; that they will warrant and defend the same; and that such percentage interests shall continue in effect notwithstanding any previous oral or written agreements to the contrary;

"NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: in consider-ation of the mutual benefits to be derived from this unitization and in further consideration of the covenants herein contained, the sufficiency of which is hereby acknowledged, it is hereby agreed, by and between the several parties hereto, that the said Buffalo Field Unit is hereby unitized, all in accordance with and as provided for under the terms, conditions and re-strictions set forth in this Unitization Agreement."

The trial court, in granting summary judgment to the defen-dants, reasoned:

"I want to start by pointing out that plaintiff has confused the issue by arguing that the habendum clauses of the various leases must be modified in order to keep the leases in effect without production on a particular lease. I agree that absent a true pooling or unitization agreement, the leases cannot be kept in production without a modification of the habendum clause. However, a pooling agreement or unitization agreement by [its] very nature keep[s] leases in force by allocating production to all the leases within the unit regardless whether any individual lease has actual production.

"A clear reading of the agreement itself establishes the following:

1. The agreement is entitled:

    Unitization Agreement
    Buffalo Oil and Gas Field
    Woodson and Wilson Counties, Kansas

    I recognize the title isn't controlling. However, that doesn't mean it can't be considered in regard to the intent of the parties. Here, it can readily be said that this refers to an agreement unitizing the Buffalo Oil and Gas Field.

2. The first two 'whereas' clauses recognize that the described leases 'encompass all, or substantially all' of the oil and gas reservoir under-lying the Buffalo Oil and Gas Field. Again, these clauses would seem to point to the fact stated, referring to the complete reservoir of oil and gas.

3. The third and fourth 'whereas' clauses set out the specific ownership interest of the mineral interest holders for the obvious purpose of identifying the owners of the various interests.

4. The fifth 'whereas' clause purports to set forth the proportion of the reserves of the Buffalo Field Unit each lease is entitled to. It is worth noting that the reference is to the Buffalo Field 'Unit', and by their subsequent execution of the agreement, the owners have acknowledged their proportional interest in the underlying reservoir.

5. The sixth 'whereas' clause combines the ownership interests with the agreement on the apportionment with the result that the interest of each mineral interest holder in the 'underlying reservoir' is established. Again, by their execution of the agreement, the interest holders have acknowledged an interest in the underlying reservoir separate from their interest in their own leases.

6. The seventh 'whereas' clause recites the recognition and (I would submit) the intent of the parties to the agreement to acknowledge that the oil and gas reservoir underlying the Buffalo Field Unit constitutes a 'common' source of supply. The clause further speaks to the advantage of not only unitized management, but operation and further economic development of the Buffalo Field Unit. This clause goes far beyond a simple 'management' agreement or 'division order['] as is argued by plaintiff.

7. The eighth 'whereas' clause relates to effective date and is not material to the issues being decided.

8. The ninth 'whereas' clause makes reference to the percentage interests of the parties as set out by their respective signatures and acknowledges that they intend for those percentage interests to remain in effect. Again, it is interesting to note that the interests they intend should remain in effect are not the interests they have in the individual leases, but are identical to their interests in the 'several mineral interests in and to the Buffalo Field Unit' as set out in the sixth 'whereas' clause.

9. Finally, we have the 'Now, therefore' clause that clearly expresses the intent of the parties to the agreement to declare the Buffalo Field Unit 'unitized' in accordance with the terms of the unitization agreement, all of which have just been discussed."

The central issue before this court is one of contract construction. "The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by an appellate court." *Godfrey v. Chandley*, 248 Kan. 975, Syl. ¶ 1, 811 P.2d 1248 (1991); *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, Syl. ¶ 1, 754 P.2d 803 (1988). In *Rook v. James E. Russell Petroleum, Inc.*, 235 Kan. 6, Syl. ¶ 1, 679 P.2d 158 (1984), this court reviewed the general rules governing the construction of oil and gas leases:

"[T]he intent of the parties is the primary question; meaning should be ascertained by examining the documents from all four corners and by considering all of the pertinent provisions, rather than by critical analysis of a

single or isolated provision; reasonable rather than unreasonable interpretations are favored; a practical and equitable construction must be given to ambiguous terms; and any ambiguities in a lease should be construed in favor of the lessor and against the lessee, since it is the lessee who usually provides the lease form or dictates the terms thereof."

The defendants ask this court to uphold the trial court's finding that the parties' intent and purpose was to execute a unitization agreement. A unit or unitization agreement is "[a]n agreement or plan of development and operation for the recovery of oil and gas made subject thereto as a single consolidated unit without regard to separate ownerships and for the allocation of costs and benefits on a basis as defined in the agreement or plan." Williams & Meyers, Manual of Oil and Gas Terms 1315 (8th ed. 1991). This court has held that

"[u]nit operation of oil and gas leases involves the consolidation or merger of one or more oil and gas leases and the designation of one or more of the parties as operator. It permits the location of induction and production wells so as to secure the most scientific use of natural or artificial energy in the reservoir in the production of oil and gas."

" 'Unit operation' means not only the process of placing a number of oil and gas leases together, centralizing management, pumping the wells and dividing the royalty proceeds according to schedule, it also means the good faith operation and prudent development of the unit." *Parkin v. Kansas Corporation Comm'n*, 234 Kan. 994, Syl. ¶¶ 4, 6, 677 P.2d 991 (1984).

See *Veverka v. Davies & Co.*, 10 Kan. App. 2d 578, Syl. ¶ 3, 705 P.2d 558 (1985) ("Unitization is a means of consolidating development of property overlying a mineral reservoir into a single production unit."); *Klippel v. Beinar*, 222 Kan. 681, 685, 567 P.2d 867 (1977). See generally 1 Kramer & Martin, The Law of Pooling and Unitization §§ 1.02, 17.02[2] (3d ed. 1991).

The plaintiffs argue the Klippel Agreement is a joint management agreement modifying the royalty clause of each lease, and the agreement's effect is to unitize the landowners' royalty interest in order to permit unit management. The plaintiffs suggest the essence of the agreement is that

"the unit operator is relieved from any liability for conversion and trespass concerning unit operations—so long as he pays in accordance with the percentage interests established in the Agreement (the conversion problem) and properly pursues unit management (the trespass problem)."

A joint management or operating agreement has been defined as:

"(1) [a]n agreement between or among interested parties for the operation of a tract or leasehold for oil, gas and other minerals. This type of agreement is frequently entered into before there has been any development. Typically the agreement provides for the development of the premises by one of the parties for the joint account. The parties to the agreement share in the expenses of the operations and in the proceeds of development, but the agreement normally is not intended to affect the ownership of the minerals or the rights to produce, in which respects, among others, the joint operating agreement is to be distinguished from a unitization agreement and from a mining partnership.

. . . .

"(2) An agreement between or among adjoining landowners or lessees concerning the development of a common pool." Williams & Meyers, Manual of Oil and Gas Terms 622-24.

In the alternative, the plaintiffs contend the Klippel Agreement functions as a division order, "by specifying and warranting how each interest owner will share in production from the unit area. This would permit the lessee to commingle production from the unit area and sell it from a common tank battery to a crude oil purchaser." A division order is defined as:

"[a] contract of sale to the purchaser of oil or gas. The order directs the purchaser to make payment for the value of the products taken in the proportions set out in the division order.

"Even though the lessee by the terms of the lease has authority to dispose of any products produced, the purchaser usually requests the operator to furnish complete abstracts of title which the purchaser causes to be examined, after which a division order is prepared by the purchaser on the basis of the ownership shown in the title opinion prepared after examination of the abstracts. The purchaser usually requires that the division order be executed by the operator, the royalty owners and other persons having an interest in the production. When the division order is executed and returned to the purchaser, payment is commenced for the products removed. The division order is typically terminable at the will of either party." Williams & Meyers, Manual of Oil and Gas Terms 334.

The defendants point out several items not contained in the agreement: An oil or gas purchaser is not a party to the agreement as is typical with division orders. Production shares are established without reference to the location of unit wells. If a lease terminates, there is no apparatus for changing the production allocation percentages. There is no express provision allowing a leaseholder to withdraw from the agreement if production ceases on the leaseholder's land.

In ascertaining the parties' intent whether the document is a unitization agreement, a joint management agreement, or a division order, the document's title can be considered. See *Skelly Oil Co. v. Cities Service Oil Co.*, 160 Kan. 226, 230, 160 P.2d 246 (1945)(In a case involving the interpretation of a document entitled "Sale of Oil and Gas Royalty," this court stated: "While it is true that the title of the instrument is not altogether controlling, yet with such a title the contents of the instrument must make it clear that it is something else than what its title indicates."). Here, the trial court found the contents of the Klippel Agreement did not indicate it was something other than its title, "Unitization Agreement."

This court is not required to accept the trial court's construction of the contract. See *Farrell v. General Motors Corp.*, 249 Kan. 231, Syl. ¶ 2, 815 P.2d 538 (1991) ("Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect."). Nonetheless, the trial court's reasoning is persuasive. After reviewing the Klippel Agreement, we agree with the trial court that the Klippel Agreement is a unitization agreement.

The plaintiffs next argue that even if we hold the agreement to be a unitization agreement, the trial court erred in finding that a unit agreement, by its very nature, keeps individual leases in effect if there is production on any of the unitized leases. The plaintiffs contend the Klippel Agreement does not modify the habendum clause included in each oil and gas lease. Each habendum clause specifies an initial or primary term ranging from one month to five years and a secondary term for "as long thereafter as oil or gas, or either, is produced from said land" or words to that effect. All 13 leases were into the secondary term when the leaseholders entered into the Klippel Agreement. The plaintiffs assert that because the primary term had expired, each lease's continuing validity "depends upon whether there has been actual continuous production in paying quantities from the leased land." The plaintiffs essentially raise three arguments: whether production for each lease must be from the individual tract, whether production was in paying quantities, and policy considerations.

The plaintiffs argue that production for each lease must be from the individual tract and not from the unit as a whole, unless

there is express agreement to the contrary. In support of this argument, the plaintiffs cite *Friesen v. Federal Land Bank of Wichita*, 227 Kan. 522, 608 P.2d 915, *disapproved in part Classen v. Federal Land Bank of Wichita*, 228 Kan. 426, 617 P.2d 1255 (1980); *Stamper v. Jones*, 188 Kan. 626, 364 P.2d 972 (1961); and *Somers v. Harris Trust & Savings Bank*, 1 Kan. App. 2d 397, 566 P.2d 775 (1977).

In *Stamper*, the plaintiffs owned six separate 80-acre tracts, upon which they executed oil and gas leases to the defendants. The validity of each lease depended upon continued production. Individual well reports were not available because monthly barrel tests on each well had not been kept and because the oil from each well producing on the six tracts had been pumped into one common tank battery. There was evidence the existing wells were not adequately draining the acreage. The plaintiffs filed suit, alleging breach of the implied covenant to develop and requesting cancellation of the leases. The trial court ordered the defendants to drill on the lease described in the third cause of action. If this well was a commercial producer, the defendants were then to drill on the lease in another quarter section. The court ruled in the defendants' favor on the other four causes of action.

On appeal, the defendants argued there was not sufficient evidence to support the trial court's decision. After concluding the evidence was sufficient, this court stated the trial court erred in making one cause of action dependent upon another.

"While this lawsuit does involve the same lessors and lessees as parties, each lease was separate and distinct from any other in its terms, and was made the subject of an independent cause of action. Neither the fact that the parties are the same, nor the fact that the tracts of land covered by the leases in question embrace oil-bearing formation comprising a common source of supply, alter the independent legal nature of the leases in question or make them dependent upon one another." 188 Kan. at 640.

"The very purpose in dividing one's real property into eighty-acre units for leasing purposes is to *assure development of each unit*. Thus production on one lease could not hold another lease beyond the primary term in the absence of independent development or production on such other lease. The same is true of the implied covenant to develop. [Citation omitted.] One lease covering an eighty-acre tract of land is in no way dependent upon a lease on another eighty-acre tract of land, even though it may join, or lie adjacent thereto, or involve the same parties, absent a binding agreement between the parties making such leases interdependent." 188 Kan. at 641.

*Stamper* is easily distinguished from the case at hand. There was no mention of a unit or unitization agreement in *Stamper*.

In *Somers*, the Court of Appeals construed a unitization agreement and noted: "The majority rule elsewhere is that where a portion of an oil and gas lease is committed to a unit, production anywhere in the unit extends the term of the entire lease. [Citations omitted.] The rule is based on conservation and public policy." 1 Kan. App. 2d at 400.

The Court of Appeals adopted the majority rule, reasoning that it was "reasonable and just under the circumstances and one which should be adopted particularly where, as here, all affected parties have agreed to the unitization." 1 Kan. App. 2d at 402. The court noted that the heart of the unitization agreement contained the following language:

" 'The production of unitized substances from the unit area through any well or wells shall be considered for all purposes as production of oil and gas from the land covered and affected by each oil and gas lease affecting any of the land within the unit area and production from any part of said unit area shall perpetuate all oil and gas leases whether or not the lands covered by any particular such oil and gas lease are productive or nonproductive.' " 1 Kan. App. 2d at 402.

The plaintiffs point out the unitization agreement in *Somers* involved an express agreement that production anywhere within the unit was sufficient to extend the lease for any individual tract in the unit. The plaintiffs cite *Friesen* to show this court's acknowledgment of that point. The *Friesen* court noted that in *Somers*, "all of the lessors and lessees in the unit had expressly agreed that production anywhere in the unit would extend all leases in the unit." *Friesen*, 227 Kan. at 525-26.

In discussing unitization agreements, Kansas cases differentiate between oil and gas leases and mineral reservations in a deed. *Edmonston v. Home Stake Oil & Gas Corp.*, 629 F. Supp. 620, 623-24 (D. Kan. 1986); see *Friesen v. Federal Land Bank of Wichita*, 227 Kan. 522; *Stratmann v. Stratmann*, 204 Kan. 658, 465 P.2d 938 (1970), *disapproved in part Classen v. Federal Land Bank of Wichita*, 228 Kan. 426, 617 P.2d 1255 (1980); *Palmer v. Brandenburg*, 8 Kan. App. 2d 154, 651 P.2d 961 (1982), *rev. denied* 233 Kan. 1092 (1983); *Somers v. Harris Trust & Savings Bank*, 1 Kan. App. 2d 397; Annot., 9 A.L.R.4th 1121, 1131 n.13.

Because this case involves oil and gas leases, the cases involving mineral reservations in a deed are distinguishable.

The defendants cite *Rogers v. Westhoma Oil Company*, 291 F.2d 726 (10th Cir. 1961), and *Klippel v. Beinar*, 222 Kan. 681, 567 P.2d 867 (1977), to support their argument that production from any tract in the unit extends all leases within the unit, unless the parties expressly state otherwise. Both cases were decided before *Somers*. In *Klippel*, this court "roughly summarized" unitization's legal results. One of those results is "[t]he life of the lease is extended as to all included tracts beyond the primary term and for as long as oil, gas or other minerals are produced from any one of the tracts included." 222 Kan. at 685.

The *Rogers* court determined the general rule was "that production from any part of a consolidated or pooled unit perpetuates all leases within the unit, even as to ununitized acreage, unless the leases provide to the contrary." 291 F.2d at 729.

The plaintiffs argue unitization agreements are not standardized; agreements vary, depending upon the parties and their needs. Thus, the plaintiffs ask the court to be cautious in reading the same terms into all unitization agreements.

The plaintiffs urge this court to follow the approach in *Clark v. Perez*, 679 S.W.2d 710 (Tex. App. 1984). In *Clark*, the Perezes entered into two oil, gas, and mineral lease agreements, dated 1964 and 1966, with Clark. The habendum clause for both leases specified the primary term was for *five* years and the secondary term was for as long as oil was produced. In 1968, the parties executed a lease amendment to merge and amend the prior leases. The lease amendment provided that the lease could not continue for more than *ten* years (from 1968) unless "mining operations" were or had been conducted.

The Perezes filed suit, alleging that all three agreements had been terminated. One of their arguments was the lease amendment did not modify the habendum clauses of the 1964 and 1966 leases. (The original leases terminated in 1971 if there was no production, and there was none.) The trial court terminated the leases.

On appeal, Clark argued the lease amendment modified the habendum clauses of the 1964 and 1966 leases. The Texas Court

of Appeals affirmed the trial court as to termination of the leases, reasoning:

"It is well settled that an oil and gas lease in Texas will be strictly construed against the lessee. [Citation omitted.] With an irreconcilable conflict between the habendum clause and recitals in a subsequent amendment, the recitals must yield. [Citation omitted.] In construing oil and gas leases, the habendum clause will control unless properly modified by other provisions, and the fixed term therein stated should not be extended by words found elsewhere in the lease not certainly directed to the modification of the habendum clause. [Citation omitted.]

"On the other hand, this is not to say that an habendum clause can never be modified, as a subsequent instrument may provide elsewhere for the enlargement of the term stated in the habendum. [Citation omitted.] It is always a question of determining the intent of the parties from the entire instrument.

. . . .

"When there is a certain answer as to the term of the lease, that answer can not be changed with words elsewhere not specifically directed to the term of the lease." 679 S.W.2d at 714.

The plaintiffs argue that "[n]othing in the Klippel Agreement even begins to rise to the level of language which is 'specifically directed to the term of the lease' or 'certainly directed to the modification of the habendum clause.' "

Here, the document in question is a unitization agreement, rather than a lease amendment. The parties' intent in executing the two documents would differ. Here, the unitization agreement is silent rather than stating a conflicting term. We are not persuaded the *Clark* decision is applicable to the case at bar.

The plaintiffs' second argument concerns whether production has been "in paying quantities." The plaintiffs admit this appeal involves issues of contract construction; however, they suggest the underlying problem is the Klippels are using marginal production on one of the 12 tracts of land to "hold hostage" the plaintiffs' leases. The defendants assert it was uncontroverted at summary judgment that there has been production on two other tracts of land within the past five years. This is accurate because the plaintiffs did not comply with Supreme Court Rule 141 (1991 Kan. Ct. R. Annot. 117) in controverting the defendants' facts. However, production some time within the past five years is not proof of continuous production or of production in paying quantities.

According to the plaintiffs, production had decreased from 5.26 barrels per day in 1987 to 1.68 barrels per day for the first five months of 1990. Although the plaintiffs suggest production has not been "in paying quantities," they do not fully brief this argument. The plaintiffs speculate that the defendants' actions have not been in good faith, but have offered no proof.

The defendants assert that this argument was not brought up at the trial court level and that the plaintiffs cannot raise it now. See *Plummer Development, Inc. v. Prairie Sate Bank*, 248 Kan. 664, Syl. ¶ 3, 809 P.2d 1216 (1991) ("The general rule is that a point not presented to the trial court will not be considered for the first time on appeal."); *Mitchelson v. Travelers Ins. Co.*, 229 Kan. 567, Syl. ¶ 2, 629 P.2d 143 (1981) ("Where the case records reflect no genuine issue of material fact before the trial court, and summary judgment is entered, a party cannot raise a new issue for the first time in the appellate court."). The trial court did not consider the issue, and we will not consider it on appeal. It is an issue the plaintiffs can raise at the trial court level at any time in the future.

The plaintiffs' third argument centers around policy considerations. The plaintiffs contend some things that occur under the "guise" of unitization are not good. In support of this, the plaintiffs cite *Parkin v. Kansas Corporation Comm'n*, 234 Kan. 994, 677 P.2d 991 (1984). Although a compulsory unitization case, the questions asked are pertinent.

"Is it prudent for an operator of a unit this large to sit for ten years pumping six wells—five of them clustered together—while leaving large areas untried? Are the six wells now being pumped adequate to produce the oil underlying the entire 5800 acres, much of which is over a mile from the nearest well? Does such operation prevent waste, conserve oil and gas and protect the correlative rights of *all* of the persons entitled to share in the production from this unit?" 234 Kan. at 1010.

The plaintiffs cite a Texas case, *Amoco Production Co. v. Underwood*, 558 S.W.2d 509, 512-13 (Tex. Civ. App. 1977), to uphold the proposition that "[u]nitization can be used to hold large blocks of acreage with minimal production."

In urging this court to strictly enforce the lease habendum clause against the lessee, the plaintiffs point out that the reasons Kansas courts have done so in the past still are applicable. In

*Reese Enterprises, Inc. v. Lawson*, 220 Kan. 300, 313, 553 P.2d 885 (1976), this court stated:

"At first glance, it would appear that the self-interest of the lessee would provide protection for the lessor. If the lease ceased to be a profitable operation it would appear to be to the interest of the lessee to abandon the project, and it would appear to be unlikely that the lessee would have any interest in continuing to operate at a loss. This conclusion, however, does not take into account the very real factor that the lessee may be interested in preserving his interest for speculative purposes. He may consider it to be to his economic advantage to continue a marginal or losing operation in order to take advantage of possible discoveries in formations other than the formation from which he is producing. He may also anticipate a change in marketing conditions or market prices of oil or gas."

The plaintiffs also note that while some states offer statutory protection for landowners entering into voluntary unitization agreements, Kansas does not. In Kansas, landowners' only protection is the contract itself and the court's interpretation of it. Therefore, the plaintiffs claim this court should not *imply* terms into unitization agreements. The defendants, however, point out that implying terms into unitization agreements is not a new concept. Many terms have been implied into unitization agreements, *e.g.*, the implied covenants to explore, develop, or market.

The plaintiffs argue that in the following cases, this court "has treated the habendum clause as a special limitation on the grant and has required *express* language to change the effect of the clause." See *Reese Enterprises, Inc.*, 220 Kan. at 309 ("court of equity has no power to extend a lease beyond the term which the parties themselves have fixed by their written contract"); *Baldwin v. Oil Co.*, 106 Kan. 848, Syl. ¶ 1, 189 Pac. 920 (1920) (although lessee did not complete the well before the end of the primary term because of "water failure, muddy roads, storms, sickness of employees, or inability to get casing as a result of the action of the government," the court terminated the lease); *Elliott v. Oil Co.*, 106 Kan. 248, 252-53, 187 Pac. 692 (1920) (lessee ceased production during the primary term of the lease because it was unable to find a market for the gas; the court terminated the lease because the lease did not provide for the contingency that developed wells might be unproductive for lack of a market).

The plaintiffs maintain that if the parties wanted production from anywhere within the unit to extend the term of the leases,

it would have been included in the agreement. The plaintiffs suggest including such is not an uncommon occurrence and cite several cases in which the agreement expressly provided that production anywhere in the unit would perpetuate all leases within the unit. See *Edmonston v. Home Stake Oil & Gas Corp.*, 243 Kan. 376, 381, 762 P.2d 176 (1988); *Martin v. Kostner*, 231 Kan. 315, 320, 644 P.2d 430 (1982); *Veverka v. Davies & Co.*, 10 Kan. App. 2d 578, 579, 705 P.2d 558 (1985); *Somers v. Harris Trust & Savings Bank*, 1 Kan. App. 2d 397, 402, 566 P.2d 775 (1977).

In commenting upon the majority rule adopted by the *Somers* court, plaintiffs' counsel, relying on his Kansas Oil and Gas Handbook, suggests that

"[p]erhaps a more appropriate basis for the rule is contract. The lessor and lessee, by contract, can specify what will, or will not, extend the lease beyond the primary term. The lease may contain a pooling or unitization clause which permits the lessee to unilaterally extend the area from which the required production can be obtained to perpetuate the lease beyond its primary term. . . . Likewise, the lessor can limit the lease area which will be held by production." 1 Pierce, Kansas Oil and Gas Handbook § 9.21, pp. 9-20 (1986).

See also 2 Kramer & Martin, The Law of Pooling and Unitization § 20.03[5] (3d ed. 1991) (focus of Kansas courts changed from intent of the parties to conservation of natural resources).

Additionally, the plaintiffs contend

"[t]he Klippel Agreement has . . . operated at the expense of the public. Had the landowners terminated the Agreement at an earlier date, they could have leased their land to other operators who may have been more interested in searching for oil and gas instead of holding large blocks of leases for speculation on the next oil boom."

Consequently, the plaintiffs argue this court should hold that unitization agreements will extend the stated duration of the leases only if expressly so provided in the unitization agreement. Such a holding, according to the plaintiffs, will not have an adverse impact upon the conservation of oil and gas because this is a contract case. The outcome of this case, as with all contracts, is dependent upon the specific terms of the contract being construed.

Although the plaintiffs raise compelling concerns, the defendants raise a stronger consideration: "To require a unit to have a well on each individual tract would frustrate the whole of efficient and economical development of the common oil or gas reservoir." This consideration is consistent with the majority rule, which states that absent an express agreement to the contrary, production within the unit will perpetuate the individual leases within the unit. For a discussion of the majority rule, see 2 Kramer & Martin, The Law of Pooling and Unitization § 20.02[1]; Annot., 35 A.L.R.4th 1167.

We see no reason to depart from the majority rule. Thus, our interpretation of the contract is the same as the trial court's: Production within the unit will perpetuate the individual leases within the unit.

The plaintiffs contend that regardless of this court's decision on the habendum clause issue, they have the authority to terminate the Klippel Agreement because the agreement does not specify its duration or when it will expire. According to the plaintiffs,

"[t]he parties agreed that unit operations could take place *so long as each party consented to continuing unit management.* . . . Instead of trying to anticipate each set of circumstances that might give rise to termination, the lessor/landowners, and the lessee/unit operator retained a continuing right to terminate the agreement at any time—subject to a reasonable notice obligation."

The defendants argue the plaintiffs err because the plaintiffs isolate the Klippel Agreement from the leases. In support of their argument, the defendants cite *West v. Prairie State Bank*, 200 Kan. 263, Syl. ¶ 3, 436 P.2d 402 (1968). The *West* court stated:

"Where two or more instruments are executed by the same parties contemporaneously, or even at different times in the course of the same transaction, and concern the same subject matter, they will be read and construed together so far as determining the respective rights and interests of the parties . . . ."

Although the same parties are not involved and the leases were executed decades before the unitization agreement, the oil and gas leases would come under the *West* rule.

In *Amortibanc Investment Co. v. Jehan*, 220 Kan. 33, Syl. ¶ 2, 551 P.2d 918 (1976), this court held:

"Where ambiguity or uncertainty is involved in an agreement, the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties."

Applying the *Amortibanc Investment Co.* holding to the facts at hand is helpful. The Klippel Agreement refers to the leases; the habendum clause of each lease specifies a fixed primary term and a secondary term; and the secondary term extends the duration of the lease as long as production continues. The Klippel Agreement relies upon the leases for its existence; the agreement must be read in conjunction with the leases. Thus, the Klippel Agreement has the same termination date as the leases.

The plaintiffs do not have the authority to terminate the Klippel Agreement so long as any lease in the unit is producing oil or gas pursuant to the terms of the applicable lease.

Affirmed.