**SLAWSON EXPLORATION COMPANY, INC. and Donald C. Slawson, Plaintiffs–Appellants,**

v.

**VINTAGE PETROLEUM, INC., Defendant–Appellee.**

No. 94–3431.

United States Court of Appeals, Tenth Circuit.

March 12, 1996.

Robert L. Howard (Timothy B. Mustaine with him, on the briefs) of Foulston & Siefkin, Wichita, Kansas, for Plaintiffs–Appellants.

David E. Rogers (Spencer L. Depew with him, on the brief) of Depew and Gillen, L.L.C., Wichita, Kansas, for Defendant–Appellee.

Before BRORBY, BARRETT, and MURPHY, Circuit Judges.

BRORBY, Circuit Judge.

Plaintiffs Slawson Exploration Co., Inc., and Donald C. Slawson (referred to collectively as "Slawson") appeal the district court's order granting summary judgment in favor of defendant Vintage Petroleum, Inc. (hereafter "Vintage") on Slawson's claim it, not Vintage, is entitled to participate in an oil and gas lease acquired by Oryx Energy Co., formerly Sun Exploration Co. (hereafter "Sun/Oryx") in 1991. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I

In September 1986, Slawson and Sun/Oryx executed a preprinted Model Form Operating Agreement published by the American Association of Petroleum Landmen, providing, *inter alia,* that Slawson would drill a well (hereafter "the Tiller # 1–9 well") into the Red River formation in Richland County, Montana. On the same day, Slawson and Sun/Oryx entered into a participation agreement covering an area of mutual interest that included the Tiller # 1–9 well site. The participation agreement provided Slawson and Sun/Oryx would jointly explore and develop the area of mutual interest, and

During the term of this [area of mutual interest], if any party hereto ("Acquiring Party") acquires any oil and gas leases or any interest therein, any unleased mineral interest or any farmouts or other contracts with respect thereto which affect lands and minerals lying within the [area of mutual interest] ("Mineral Interest"), the Acquiring Party shall promptly advise the other party hereto ("Offeree") of such acquisition. In such event, Offeree shall have the right to acquire its proportionate interest in such Mineral Interest in accordance with the other provisions of this [area of mutual interest].

The area of mutual interest was to remain in effect for twelve months, "or as long as the Operating Agreement covering the [area of mutual interest] lands remains in effect, unless sooner terminated by the parties."

Although the operating agreement required Slawson to drill the Tiller # 1–9 well into the Red River formation, Slawson later determined the well would be a commercial producer from the shallower Duperow formation. After Slawson completed the Tiller # 1–9 well in the Duperow formation, it attempted to acquire a 320–acre spacing unit. Slawson's attempt met with opposition, and the Montana Board of Oil and Gas Conservation ultimately ordered a 160–acre spacing unit in October 1987.

Two years later, in September 1988, Vintage purchased several properties from Slawson, including the Tiller # 1–9 well and its then 160–acre spacing unit, for $55 million. In the Assignment, Bill of Sale and Conveyance, executed in November 1988, Slawson assigned Vintage

1. All right, title and interest in and to those certain oil, gas and mineral leases, described in Exhibit "A" attached hereto and made a part hereof, in and to the entire estates created by the leases, licens-

es and permits described in Exhibit "A" and "A–1" (herein called the "Leases") ... insofar as the Leases cover and relate to the hydrocarbons under the land described in Exhibit "A" and "A–1" (herein called the "Land"), together with identical undivided interests in and to all the property and rights incident thereto, including but not limited to all rights in, to and under all agreements, leases, permits, easements, right-of-way, licenses, joint operating agreements, pooling and spacing orders, communitization agreements, and other instruments in any way related thereto.

The Tiller # 1–9 well is listed in Exhibit A to the Assignment, Bill of Sale and Conveyance. Exhibit A states as follows: "Tiller unit # 1–9: This assignment is expressly limited to the spacing unit for the Tiller # 1–9 well, being the E/2 NE/4 Section 9, and all of Section 10, T25N, R55E, Roosevelt, MT."[1] Sun/Oryx operated the Tiller # 1–9 well after the acquisition.

By January 1991, production from the Duperow formation had become uneconomical, so Sun/Oryx recompleted the Tiller # 1–9 well in the deeper Red River formation using its existing wellbore. Under applicable regulations, the appropriate spacing unit for a well in the Red River formation was 320 acres. Sun/Oryx therefore expanded the Tiller # 1–9 spacing unit from 160 acres to 320 acres by acquiring new leases covering an additional 160 acres adjacent to the existing spacing unit (hereafter "the additional 160 acres"). In June 1991, Sun/Oryx informed Slawson it had acquired the additional 160 acres, but that it believed Vintage, as Slawson's assignee, was entitled to participate in the additional acreage pursuant to the 1986 participation agreement. Shortly thereafter, Slawson brought this action in district court, seeking a declaratory judgment that it, not Vintage, is entitled to participate in the additional 160 acres under the 1986 participation agreement. The parties filed cross-motions for summary judgment, and the district court entered judgment in favor of Vintage. This appeal followed.

## II

The parties have stipulated that the participation agreement between Slawson and Sun/Oryx remains in effect by virtue of continuing operations within the area of mutual interest, that Sun/Oryx's acquisition of the additional 160 acres was the type envisioned by the original participation agreement, that the additional 160 acres were within the area of mutual interest, and that the participation agreement obligated Sun/Oryx to offer an interest in the additional 160 acres either to Vintage or to Slawson. Vintage contends, however, that Slawson assigned its interest in the participation agreement when it executed the Assignment, Bill of Sale and Conveyance, and that Vintage, as Slawson's assignee, has succeeded to any participation rights Slawson might have had in the additional 160 acres. In response, Slawson contends Exhibit A to the Assignment, Bill of Sale and Conveyance makes it clear it did not intend to assign its right to participate in the additional 160 acres to Vintage. The case therefore turns on how we interpret the Assignment, Bill of Sale and Conveyance, and Exhibit A.

It is well established under Kansas law, which the parties agree governs this case, that in construing a contract "the intent of the parties is the primary question." *Akandas, Inc. v. Klippel,* 250 Kan. 458, 827 P.2d 37, 44 (1992) (citation omitted). "Unless a written instrument is ambiguous or vague in its terms, that intention must be determined from the instrument as a whole or, as is often stated, from its 'four corners', which simply means that all of the language used anywhere in the instrument should be taken into consideration and construed in harmony with other provisions of the contract." *Texaco, Inc. v. Holsinger,* 336 F.2d 230, 233 (10th Cir.1964) (applying Kansas law), *cert. denied,* 379 U.S. 970, 85 S.Ct. 669, 13 L.Ed.2d 563 (1965). A contract is ambiguous only if "the application of the rules of interpretation to the face of the instrument leaves it genuinely uncertain as to which of two or more mean-

1. The parties have stipulated that the legal description of the Tiller # 1–9 spacing unit in Exhibit A is incorrect. The 160–acre spacing unit was actually comprised of the E/2 NE/4 Section 9, and the W/2 NW/4 of Section 10, T25N, R55E, Roosevelt, MT.

ings is proper." *Id.* If the contact is ambiguous, "the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties." *Klippel,* 827 P.2d at 51 (citation omitted); *Boos v. National Fed'n of State High Sch. Ass'ns,* 20 Kan.App.2d 517, 889 P.2d 797, 804 (1995) (extrinsic evidence admissible to aid interpretation of genuinely ambiguous contract provision).

Standing alone, paragraph 1 of the Assignment, Bill of Sale and Conveyance is far from ambiguous. It states that Slawson intended to assign Vintage the "Leases" and "Land" listed in Exhibit A, which includes the Tiller # 1–9 well and its then 160–acre spacing unit, "together with identical undivided interests in and to all the property and rights incident thereto, including but not limited to all rights in, to and under all agreements, leases ... and other instruments in any way related thereto." Inasmuch as the participation agreement granted Slawson the right to participate in any property Sun/Oryx might acquire after September 1986 to supplement the Tiller # 1–9 spacing area, Slawson's rights under the participation agreement were "related" to the Tiller # 1–9 well. Thus, under paragraph 1 of the Assignment, Bill of Sale and Conveyance, Slawson appears to have assigned its entire interest in the Tiller # 1–9 well to Vintage, including its participation rights.

Slawson reminds us, however, that we cannot interpret paragraph 1 of the Assignment, Bill of Sale and Conveyance in isolation, but that we must review the document as a whole, including the attached exhibits, to determine the intent of the parties. *Holsinger,* 336 F.2d at 233. Slawson draws our attention to Exhibit A, which states as follows: "Tiller unit # 1–9: This assignment is expressly limited to the spacing unit for the Tiller # 1–9 well, being the E/2 NE/4 Section 9, and all of Section 10, T25N, R55E, Roosevelt, MT." According to Slawson, this language shows it intended to assign only the 160 spacing unit, and not the participation

rights related to it. Although we agree Exhibit A renders paragraph 1 of the Assignment, Bill of Sale and Conveyance ambiguous, we see no merit in Slawson's contention.

If the language of a written contract is ambiguous, we may look beyond the four corners of that document to determine the intent of the parties. *Klippel,* 827 P.2d at 51; *Boos,* 889 P.2d at 804. "Whether an ambiguity exists in a written instrument is a question of law to be decided by the court." *Kennedy & Mitchell, Inc. v. Anadarko Production Co.,* 243 Kan. 130, 754 P.2d 803, 806 (1988). However, "[o]nce it is determined that a contract is ambiguous and that its construction depends on extrinsic circumstances, interpretation of the contract becomes a question of fact." *City of Farmington v. Amoco Gas Co.,* 777 F.2d 554, 560 (10th Cir.1985). During oral argument, the parties agreed that even if we were to conclude the Assignment, Bill of Sale and Conveyance and the attached exhibits, taken as a whole, are ambiguous, it would not be necessary to remand the case to the district court to determine the intent of the parties at the time of execution, because the record contains all of the relevant extrinsic evidence and the extrinsic evidence is undisputed. *See Weiner v. Wilshire Oil Co. of Texas,* 192 Kan. 490, 389 P.2d 803, 810 (1964) (Schroeder, J., concurring) ("Where, as here, extrinsic evidence is conclusive and undisputed and renders the meaning of an instrument clear, construction of such instrument becomes a question of law for the court.").

We need not look very far to determine what the parties intended when they agreed to the quoted portion of Exhibit A. Slawson explained the language as follows in its complaint:

> [The Tiller # 1–9 assignment] was limited to the production spacing unit on the existing well [i.e., the original 160 acres] because Slawson retained the right to drill and develop contiguous acreage through the retention of the Georges # 1–4 [proven undeveloped property (hereafter "PUD") ]. To preserve Slawson's right to drill the Georges # 1–4, Slawson limited its conveyance on the Tiller # 1–9 to only the 160 acre producing unit and the formal assign-

ment of interests to defendant Vintage, pursuant to the Slawson/Vintage agreement was expressly limited to the spacing unit for the Tiller # 1–9 as it then existed. The complaint further alleges in conclusory fashion that "[t]he spacing unit limitation on the interests Slawson transferred to Vintage also applied to the assignment of plaintiffs' contract rights under the September 9, 1986 [participation] agreement with Sun." In the pretrial order, Slawson and Vintage entered into the following stipulations:

9. One prospect that Slawson wanted to and did exclude was the Georges # 1–4. The Georges # 1–4 was located immediately northwest of the Tiller # 1–9 but outside of the Tiller # 1–9 spacing unit.

10. In order to preserve Slawson's right to drill the Georges # 1–4 prospect, Slawson limited the assignment of the Tiller # 1–9.... The legal description in th[e] assignment of the Tiller # 1–9 well did not correctly describe the spacing unit of the Tiller # 1–9 well [at the time the parties executed the Assignment, Bill of Sale and Conveyance].

11. Following the closing of the Slawson/Vintage transaction, Slawson drilled the Georges # 4–1 [sic] well within the Georges # 1–4 prospect. Vintage agreed that Slawson could drill this well and never claimed that they owned any interest therein. The Georges # 4–1 [sic] well was a dry hole.

Finally, in its brief, Slawson repeats its "frank admission ... that its motive for confining its assignment to leasehold interests within the Tiller spacing unit was its desire to retain properties outside the spacing unit that would be useful in developing the Georges # 1–4 prospect."

In light of the above, we conclude as a matter of law that the sole purpose of the quoted portion of Exhibit A was to clarify the location and dimension of the Tiller # 1–9 spacing unit, in order to prevent disputes over the boundary between the Tiller # 1–9 spacing unit and the adjacent Georges # 1–4 prospect Slawson intended to retain. We see no merit in Slawson's contention it intended to retain the participation rights related to the Tiller # 1–9 well, or that it intended to

retain any part of its interest in the Tiller # 1–9 well when it executed the Assignment, Bill of Sale and Conveyance. Accordingly, Vintage, not Slawson, is entitled to participate in the additional 160 acres.

**AFFIRMED.**