**Harry CARLISLE and Neva C. Carlisle, his wife, Appellants,**

v.

**UNITED PRODUCING COMPANY, Inc., Appellee.**

**No. 6242.**

United States Court of Appeals
Tenth Circuit.

May 19, 1960.

Charles R. Nesbitt, Oklahoma City, Okl. (Tom Hieronymus, Woodward, Okl., on the brief), for appellants.

C. Harold Thweatt, Oklahoma City, Okl. (Embry, Crowe, Tolbert, Boxley & Johnson, Oklahoma City, Okl., on the brief), for appellee.

Before PICKETT and BREITEN-STEIN, Circuit Judges, and SAVAGE, District Judge.

PICKETT, Circuit Judge.

United Producing Company, Inc., brought this action to quiet its title as lessee under four oil and gas leases on lands in Beaver County, Oklahoma. The defense was that the leases had terminated for United's failure to make shut-in royalty payments to the lessors, Harry Carlisle and Neva C. Carlisle, as provided for in the leases. The principal question arises out of the contention that after the discovery of the gas by United, the shut-in payments provided for in the leases were rentals or lease fees payable entirely to the lessors, and were not to be treated as royalties. The trial court found for United and entered judgment quieting its title to the leases.

The facts are not in dispute. The Carlisles owned one-half of the minerals under the leased premises and a group of persons known as the "Coffman heirs" owned the other one-half. As a result of cross-conveyances between the mineral owners, the Carlisles were to receive "all sums accruing from rentals or lease fees on account of any lease or leases on the said lands," and were given the exclusive power and authority to lease the lands or any part of them for oil or gas and other mineral development. On April 20, 1955, United leased the lands from the Carlisles under four separate leases, each for a primary term of ten years and as long thereafter as oil or gas was produced therefrom. Each lease provided that if the drilling of a well for oil or gas was not commenced before the expiration of one year, the lease would terminate un-less the lessee paid a fixed sum equal to $1.00 per acre. Drilling operations could be delayed for successive years by the payment of a like amount. The leases further provided that if the lessors owned less than the entire fee simple title, the royalties and rentals paid to them would be in the proportion which their interest bore to the whole. At least one well capable of producing gas in paying quantities was drilled on each lease within the primary term, but all the wells were shut in for lack of a market.[1] The leases contained the following shut-in royalty provision:

> "Where gas from a well or wells, capable of producing gas only, is not sold or used for a period of one year, lessee shall pay or tender as royalty, an amount equal to the delay rental as provided in paragraph (5) hereof, payable annually at the end of each year during which such gas is not sold or used, and while said royalty is so paid or tendered this lease shall be held as a producing property under paragraph numbered two hereof."[2]

United construed the shut-in payments required by the leases to be royalties, and tendered to the Carlisles only one-half of the amount due, and paid the other one-half to the Coffman heirs. The Carlisles refused to accept the payments, contending that the leases had terminated according to their terms for United's failure to pay the Carlisles all of the shut-in royalties within the time provided for in the leases. The position of the Carlisles is predicated upon the theory that the shut-in payments are rentals or lease fees, and not royalties, and that a failure to make such payments in their entirety to them within the time specified, terminated the leases. The trial court found that the shut-in royalty payments were not lease fees, that they were made with-

---

1. One month before the filing of the complaint in this action, deliveries of gas from each well were commenced to Colorado Interstate Pipe Line Company.

2. Paragraph 2 of each lease reads:
   "This lease shall remain in force for a term ending April 20th, 1965, and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them is produced."

in one year after the completion of the first well on each lease,[3] and that they were timely and in correct amounts.

The shut-in royalties were to be paid "at the end of each year during which such gas is not sold or used." Clearly the one-year period for remittance of shut-in payments did not begin to run until a particular well was capable of producing gas in marketable quantities, which would be when it was completed. Therefore, we conclude that the payments were timely.

As to the correctness of the amounts tendered to the Carlisles, the intent of the parties to the oil and gas leases controls. Panhandle Eastern Pipe Line Co. v. Isaacson, 10 Cir., 255 F.2d 669; Bascom v. Maxey, 195 Okl. 259, 157 P.2d 158. Where the instrument, viewed in its entirety, is unambiguous, the intention of the parties is to be determined from its language. Surety Royalty Co. v. Sullivan, Okl., 275 P.2d 259; Meeks v. Harmon, 207 Okl. 459, 250 P.2d 203.

We agree with the trial court that the sums required to be paid under the shut-in provision of the leases were in the nature of minimum royalty payments and were not to be considered as rentals or lease fees. The lease provision in question specifically requires that when a well or wells, capable of producing gas only, is shut in and the gas is not sold or used for a period of one year, United "shall pay or tender as royalty" an amount equal to delay rentals, and it further provides that "while said royalty is so paid or tendered," the lease shall be considered "as a producing property," thus effectuating the provision extending the lease beyond its primary term. Delay rental fees would not accomplish such an extension. These clear and specific provisions appear to be subject to no other reasonable interpretation than that the parties intended the shut-in payments to be treated as royalties and have the same effect as though they were due from actual production. Summers Oil and Gas, Vol. 3A, § 597.3; Morriss v. First Nat. Bank of Mission, Tex.Civ. App., 249 S.W.2d 269.[4] Discovery of gas in paying quantities constituted a compliance with the production requirements of the habendum clause in the leases and the rental provisions were no longer applicable. Thereafter, the rights of the Carlisles, as mineral owners, were limited to royalty payments or a substitute therefor.

Affirmed.

---

3. Finding of Fact number two is as follows:

"2. Facts relevant to issues of this action, about the first gas well drilled upon each of the four leases involved in this action are shown in the following tabulation:

| Well Name | Located Upon | First Well Completed | Shut-in Royalty Payment Mailed to Defendant | Amount of Check |
|---|---|---|---|---|
| Carlisle No. 1 | S 1/2 Sec. 10 | 12– 3–56 | 11–14–57 | $160.00 |
| Carlisle No. 2 | S 1/2 & S 1/2 N 1/2 Sec. 15 | 5–26–57 | 5–16–58 | $240.00 |
| Carlisle No. 3 | All of Sec. 16 | 7– 9–57 | 6–27–58 | $320.00 |
| Carlisle No. 5 | W 1/2 Sec. 23 | 10– 6–57 (Chester) 10–12–57 (Morrow)" | 9–29–58 | $160.00 |

This finding is based upon undisputed evidence.

---

4. Interesting discussions of shut-in royalty clauses in oil and gas leases are found in Fourth Annual Rocky Mountain Mineral Law Institute, p. 315, and Fourth Annual Institute on Oil and Gas Law and Taxation, p. 17.