No. 53,307

K. S. Martin, *et al., Appellees,* v. Gary Kostner, *et al., Appellants.*

(644 P.2d 430)

Opinion filed May 8, 1982.

· *Clifford L. Malone,* of Adams, Jones, Robinson and Malone, Chartered, of Wichita, argued the cause, and *Robert M. Collins,* of Collins & Collins, of Wichita, was with him on the brief for the appellees.

*Keith Martin,* of Smith, Shay, Farmer & Wetta, of Wichita, argued the cause, and *William C. Farmer* and *Patricia M. Dengler,* of the same firm, and the firm of *Geisert & McKenna,* of Kingman, were with him on the briefs for the appellants.

The opinion of the court was delivered by

McFarland, J.: This is an action by the lessees to quiet their title in certain oil and gas leasehold estates. The defendant-landowners appeal from an adverse judgment by the trial court. The plaintiff-lessees cross-appeal on a single issue.

The factual situation from which this controversy arises is involved and often technical. Although additional facts will be supplied later as needed, the following synopsis provides an adequate factual foundation.

Defendants are the owners of the surface and minerals in and to three parallel 80-acre tracts in Kingman County. On November 6, 1975, defendants executed identical oil and gas leases on each of the tracts, said tracts being hereinafter referred to as B-1, B-2 and B-3. The leases were for a primary term of three years and "as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them, is produced from said land or land with which said land is pooled." The Kostner B-1, B-2 and

B-3 oil and gas leases were on Form 88 (Producers) Kansas, Oklahoma and Colorado 1962 Rev. Bw form, a standard form used in the industry. By mesne assignments, plaintiffs became the lessees under these leases.

In July, 1978, drilling was commenced on tract B-1. All testing indicated gas only was present in commercial quantities in both the Mississippi Chert and Mississippi Dolomite formations. On September 1, 1978, the well was completed and shut in awaiting hookup with the Peoples Gas Line. In October, 1978, K. S. Martin, the plaintiff-operator, executed an Affidavit of Production and a Declaration of Gas Unit, the latter being filed on October 16, 1978.

The pipeline hookup was made in late December, 1978, and the B-1 well was turned on January 3, 1979. Within a few days the well commenced producing, in addition to the gas, a substantial amount of oil and has continued to do so. On February 26, 1979, plaintiffs began drilling a well on B-2. Said well has been completed and is now producing both oil and gas, similar to its sister well on B-1. Defendants challenged plaintiffs' right to drill on B-2 and this action resulted. Subsequently, defendants disputed plaintiffs' interest in any tract. The trial court upheld the plaintiffs' leasehold interests in the three tracts and defendants appeal.

The trial court's decision herein consisted of twenty-five pages of findings of fact and conclusions of law. Before proceeding to discussion of the individual issues on appeal, it is appropriate, for orientation purposes, to summarize the trial court's key findings and conclusions as follows:

1. The lease for B-1 was extended beyond the primary term by operation of the shut-in royalty clause. This clause requires payment of shut-in royalties only after the well has been shut in one year, as opposed to payment at the end of the primary lease term.

2. Upon discovery of gas in B-1, the pooling clause in all three leases allowed all three tracts to be unitized. Upon unitization, all three leases were extended beyond the primary term "for all purposes." This includes the drilling of the B-2 well, the main purpose of which was to obtain oil.

3. The gas discovered in B-1 was not "casinghead gas" and the B-1 well was not an "oil well." Thus, the restrictions in the lease as to unitization do not apply. B-1 is properly classified as a

"combination well." Nothing in the lease prohibits unitization as to the "gas rights" based on a combination well.

We turn now to the specific issues on appeal. Defendants contend that the failure of the plaintiffs to tender or pay shut-in royalties before the end of the primary term resulted in the lease terminating at the end of the primary term. The applicable lease provisions are as follows:

"[A]t any time, either before or after the expiration of the primary term of this lease, if there is a gas well or wells on the above land . . . and such well or wells are shut in before or after production therefrom, lessee or any assignee hereunder may pay or tender annually at the end of each yearly period during which such gas well or gas wells are shut in, as substitute gas royalty, a sum equal to the amount of delay rentals provided for in this lease for the acreage then held under this lease by the party making such payments or tenders, and if such payments or tenders are made it shall be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities."

The trial court reasoned as follows:

"The Kostner B-1 lease was drilled before the expiration of its primary term. It was completed as a well capable of producing gas only in paying quantities. The lease was extended beyond its primary term because of the shut-in royalty clause which provides that a gas well may be shut-in after discovery and will continue in full force and effect upon paying at the end of each yearly period a sum equal to the amount of delay rentals provided for in the lease. This one-year period for remittance of shut-in payment does not commence until a well capable of producing gas is completed. *Robinson vs. Continental Oil Company*, 255 Fed. Supp. 61 (D.C. Kan. 1966). The Kostner B-1 lease was therefore perpetuated beyond its expiration date by the shut-in royalty clause and since it was placed in production long before the expiration of the one-year period, such lease remained in full force and effect from its shut-in date and was extended by such shut-in clause beyond its primary term."

We agree with the trial court. Its conclusion comports with the interpretation of this type of shut-in royalty clause in *Carlisle v. United Producing Company*, 278 F.2d 893 (10th Cir. 1960) and *Robinson v. Continental Oil Company*, 255 F. Supp. 61 (D. Kan. 1966). Cases cited by defendants to the contrary involved clearly distinguishable shut-in royalty clauses, and are not on point. The clear language of the clause here did not require payment until one year after the well was shut in. The trial court did not err in concluding the B-1 lease was perpetuated beyond its expiration by the shut-in royalty clause and remained in full force and effect when production commenced in January, 1979.

We turn now to the issues relative to the validity and scope of

the unitization of the leases herein. This hotly contested area of the litigation has spawned a number of issues on appeal. The leases herein contain the following provision relative to unitization:

"5. Lessee is hereby granted the right to pool or consolidate the leased premises, or any portion or portions thereof, as to all strata, or any stratum or strata, with other lands as to all strata, or any stratum or strata, but only as to the gas right hereunder (excluding casinghead gas produced from oil wells) to form one or more gas operating units of not more than 640 acres, plus a tolerance of ten per cent (10%) to conform to Governmental Survey quarter sections. Lessee shall file written unit designations in the county in which the premises are located. Such units may be designated either before or after the completion of wells. Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not. The entire acreage pooled into a gas unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if it were included in this lease. In lieu of the royalties herein provided, lessor shall receive on production from the unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein on an acreage basis bears to the total acreage so pooled in the particular unit involved."

This provision does not permit unitization of casinghead gas produced from oil wells. Defendants contend the gas produced from B-1 is casinghead gas and hence legally insufficient to support unitization. As would be expected, considerable technical evidence was introduced on this subject. The trial court made numerous findings relative to the casinghead gas controversy. Particularly illuminating are the following:

"23. The gas being produced from the Kostner unit is not casinghead gas. Casinghead gas is natural gas that is absorbed in solution, such solution being oil. As the oil is being removed from the oil zone, the pressure which it has been under is lessened. The casinghead gas then comes out of the solution in a gaseous form. The amount of casinghead gas which can be absorbed in a barrel of oil depends upon pressure and temperature, but in an area such as the Kostner field, the amount of gas would not be more than 500 cubic feet for a barrel of oil. From the amount of oil that was produced from the Kostner lease in 1979 of approximately 12,000 barrels such oil could not have contained more than 6 million cubic feet of gas. During this time the Kostner unit produced in excess of 34 million cubic feet of gas. It is therefore apparent that the gas being produced is from a gas zone lying above the oil zone and such gas is not casinghead gas coming out of solution.

"24. Casinghead gas may be compared to carbon dioxide which is absorbed in a bottle of soda pop. When the cap is released, the soda commences to bubble. Thus, when the pressure is released, the absorbed carbon dioxide comes out of the solution in a gaseous form. Casinghead gas is natural gas absorbed in oil solution

in the same manner. The reason casinghead gas is prohibited from being utilized is because being confined in the oil solution it is no more mobile and it cannot be drained from a larger area than oil itself. In the Kostner B unit the gas is contained in a gas cap overlying an oil zone. While it may be defined as associated gas, it is not casinghead gas as that term is used and meant in the pooling clause of the oil and gas lease wherein casinghead gas as well as oil cannot be unitized.

. . . .

"28. . . . [G]as from a gas cap . . . . is more properly defined as associated gas which is 'free natural gas in immediate contact but not in solution with crude oil in the reservoir.' . . . Associated gas or gas from a gas cap constitutes a gas right under the oil and gas lease permitting unitization or pooling of such right."

These findings are supported by substantial competent evidence and, accordingly, will not be disturbed on appeal. *City of Council Grove v. Ossmann,* 219 Kan. 120, 546 P.2d 1399 (1976).

As will be recalled, the leases exclude pooling of *"casinghead gas produced from oil wells."* We have just determined that the gas herein was not *"casinghead gas."* Defendants take separate issue with the phrase *"from oil wells."* They contend B-1 could only be classified as an oil well because *inter alia* the oil produced is of significantly greater economic value than is the gas (79% compared to 21%) and a pump was placed on the well in February, 1979. Defendants specifically challenge the trial court's finding that the well on B-1 was a combination well. The classification of the well on B-1 is essentially a question of fact and the trial court's findings are supported by substantial competent evidence and will not be disturbed on appeal. There is nothing in the lease prohibiting unitization as to the "gas rights" based on a combination well.

Defendants' next point on appeal is that the trial court erred in holding that plaintiffs' unitization "for gas rights only" carried with it the right of plaintiffs to drill for and keep oil production on the unitized tracts.

At the time B-1 was drilled, all parties were hopeful it would be an oil well. A verbal agreement had been entered into with the drilling contractor working on B-1 to move the equipment to B-2 and commence drilling if B-1 had oil capabilities. When B-1 tested out a gas well, the drilling rig was released. One gas well can drain 640 acres as opposed to an oil well which can drain only about 40 acres. It was therefore not economically feasible to drill another gas well on the adjacent 80 acres. Instead plaintiffs exercised their contract right to unitize the three tracts. After B-1

began producing oil in substantial quantities, the plaintiffs proceeded to drill on B-2. The well was another combination well which would, however, not have been drilled but for the anticipated oil production.

Defendants contend that even if unitization was proper, it was limited by the leases to the "gas right" and thus did not authorize plaintiffs to drill for oil on B-2 or B-3. Essentially, they argue that when the primary term of the B-2 and B-3 leases expired on November 6, 1978, without production from wells situated on those tracts, the leases expired for all minerals except gas which had been unitized for production from the B-1 well.

An examination of the leases as a whole refutes this argument. Each lease specifically stated it was for a primary term of three years and "as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them, is produced from said land *or land with which said land is pooled*" (emphasis supplied). In addition, the unitization clause provided in part:

"Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not. The entire acreage pooled into a gas unit shall be treated *for all purposes,* except the payment of royalties on production from the pooled unit, as if it were included in this lease." (Emphasis supplied.)

The language of these two clauses is clear and unambiguous. The valid unitization of B-2 and B-3 with B-1 extended the leases thereon for all purposes so long as gas production continued on B-1 (or the shut-in equivalent heretofore discussed). The fact that the B-1 well, after unitization, commenced producing both gas and oil in commercial quantities in no way alters the legal status of the parties. Accordingly, when the plaintiffs drilled the well on B-2, they did so under the authority of the entire extended lease, not just under the unitization clause.

Defendants cite *Skelly Oil Co. v. Savage,* 202 Kan. 239, 447 P.2d 395 (1968), in support of their position. In *Skelly* a well was drilled on one tract of land and three other tracts were unitized with it under a clause, identical to that in this case, limiting the unitization to "gas rights" only. The well then produced certain liquid hydrocarbons along with the gas and the issue became whether the owners of the other tracts in the unit could share in the royalty interest for this liquid as well as the gas. The court affirmed the trial court's finding that the liquid was a condensate

or distillate associated with the gas produced from a gas well and held the royalties should be shared. No question appears in the case before us as to how or whether the royalty for the oil admittedly produced from the B-1 well is to be shared among the owners of the unitized tracts. *Skelly* is not on point to the issue herein.

We conclude the trial court did not err in holding:

"[T]he Plaintiffs acquired a gas right in the Kostner B-1 well which it was entitled to pool to prevent both economic and physical waste. The fact that such well may have subsequently become a combination well capable of producing both gas and oil in paying quantities does not detract from the fact that the gas right thereunder is and was properly unitized.

"Since the Kostner B-1 is producing gas from a gas cap, the unit B-1, B-2 and B-3 has been and is being perpetuated so long as such production continues in paying quantities. Since the Kostner unit was validly formed as to the gas right, it perpetuated the three leases 'for all purposes.' "

This result is in harmony with 6 Williams and Meyers, Oil and Gas Law § 973.2 (1981).

Finally, defendants argue plaintiffs did not act in good faith. Defendants specifically complain of the fact that plaintiff Martin had already filed the Declaration of Gas Unit when he sought agreement of some defendants to unitize. Conceivably, bad faith in concealing the true nature of a well or some equally serious matter might affect a contractual right to unitize. There is nothing herein even approaching such bad faith and the trial court made no findings of bad faith in any degree. This point is without merit.

The trial court held in favor of the plaintiffs on some alternative theories. Having reached the conclusions heretofore expressed, we need not determine the propriety of those alternative holdings. The cross-appeal, as noted by the cross-appellants, need not be determined by virtue of our affirmance of the trial court of the issues on appeal.

The trial court is to be complimented on its thorough and skillful handling of this highly technical and complex case.

The judgment is affirmed.