Nos. 100,132, 100,133, 100,134, 100,135, 100,136, 100,137

MICHAEL L. LEVIN, DIANE L. LEVIN, and KANSAS GAS EX-
PLORATION, LLC, *et al.*, *Appellees*, v. MAW OIL & GAS, LLC
and CLARY ENERGY, LLC, *Appellants*.

(234 P.3d 805)

Opinion filed July 16, 2010.

*Jeff Kennedy*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Teresa Mah*, of the same firm, was with him on the brief for appellants.

*Lee M. Smithyman*, of Smithyman & Zakoura, Chartered, of Overland Park, argued the cause, and *Constance L. Shidler*, of the same firm, was with him on the briefs for appellees.

*Will B. Wohlford, Jeffery L. Carmichael*, and *Ralph R. Brock*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, were on the brief for *amici curiae* Dart Energy Corporation.

*David G. Seely*, and *Gregory J. Stucky*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, were on the joint brief for *amici curiae* Eastern Kansas Royalty Owners Association and Southwest Kansas Royalty Owners Association.

The opinion of the court was delivered by

BEIER, J.: This appeal concerns a dispute over six oil and gas leases. Landowners Michael L. Levin and Diane L. Levin; James L. Bell and Sheila R. Bell; Jeffrey Eidemiller and Diane Eidemiller; Donald R. Eidemiller and Sandra K. Eidemiller; Silver Star Ranch,

LLC; Robert R. Mazza II and Carol M. Mazza; and Kansas Gas Exploration, LLC (KGE), filed separate petitions to quiet title against Maw Oil & Gas, LLC (Maw), and Clary Energy, LLC (Clary) (collectively lessees). Landowners requested that the district court declare: (1) Lessees have no right, title, or interest in the landowners' realty; (2) title to landowners' realty is vested in the landowners; and (3) KGE has the sole right to develop natural gas wells on landowners' realty. The district court consolidated the cases and granted summary judgment to the landowners before any pretrial discovery, determining that the governing leases had terminated. Lessees appealed, arguing that the leases had not terminated because their shut-in royalty clauses extended them past their primary terms. Lessees have also asserted that genuine issues of material fact should have prevented summary judgment.

Before we set forth the factual background of this consolidated matter, certain basics regarding oil and gas leases merit brief review. Judge Richard Greene succinctly recited an appropriate opening to such a review in the recent Court of Appeals case, *Welsch v. Trivestco Energy Co.*, 43 Kan. App. 2d 16, 21-22, 221 P.3d 609 (2009), and we borrow from it here:

"[O]il and gas law is not so much a unique body of law as it is a specialized application of contract law. The rights and obligations of those operating in the Kansas oil patch are governed by the terms and conditions of specialized contracts, and each dispute arising in this context can and should usually be resolved by the construction and application of such contracts. Although parties to such disputes often seek to rely on and argue the application of case law, we must decline to blindly apply what may appear to be legal principles within such precedent without a preliminary determination whether the contract provisions at issue in the cited authority are identical to those before us. This is particularly true in construing a shut-in royalty clause. [Citation omitted.]

"Notwithstanding the importance of the particular lease terms and conditions, certain general characteristics of shut-in royalty clauses should be noted. The concept underlying such clauses is to enable a lessee, under appropriate circumstances, to keep a nonproducing lease in force by the payment of the shut-in royalty and that such a clause by agreement of the parties creates constructive production. In this manner, the clause can modify and become an integral part of the habendum clause, or extension clause, of the lease." [Citation omitted.]

Black's Law Dictionary 778-79 (9th ed. 2009), defines a "habendum clause" as

"[t]he provision in an oil-and-gas lease defining how long the interest granted to the lessee will extend. Modern oil-and-gas leases typically provide for a primary term—a fixed number of years during which the lessee has no obligation to develop the premises—and a secondary term (for 'so long thereafter as oil and gas produced') once development takes place."

This court has referred to the secondary term described in Black's Law Dictionary as a " 'thereafter' provision," or an "extension clause, of the habendum clause of an oil and gas lease." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 380, 855 P.2d 929 (1993). A lease may be extended past its primary term under a thereafter provision when a lessee produces oil or gas in paying quantities during the primary term. See *Tucker*, 253 Kan. at 380; *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 353, 662 P.2d 255 (1983); *Texaco, Inc. v. Fox*, 228 Kan. 589, 592, 618 P.2d 844 (1980); *Tate v. Stanolind Oil & Gas Co.*, 172 Kan. 351, 354-55, 240 P.2d 465 (1952). The phrase "in paying quantities," as found in a thereafter provision, "means production of quantities of oil and gas sufficient to yield a profit to the lessee over operating expenses, even though the drilling costs or equipping costs are never recovered and even though the undertaking as a whole may thus result in a loss to the lessee." *Tucker*, 253 Kan. at 381 (citing *Pray*, 233 Kan. at 355). "[I]n paying quantities" is an implicit part of a habendum clause; the phrase applies even if it does not appear in the lease. *Tucker*, 253 Kan. at 380 (citing *Pray*, 233 Kan. at 353).

On the other hand, a shut-in royalty clause such as those at issue here and as discussed in *Welsch* allows a lessee to keep a lease in force when a well *capable of producing* is not utilized because there is no market for the oil or gas." (Emphasis added.) Black's Law Dictionary 1446 (9th ed. 2009).

This court in *Tucker* explained:

"The shut-in royalty clause was developed to protect against automatic termination of a lease where a gas well was drilled and *no* market existed for that gas. The reason that the shut-in royalty clause has come into growing use goes back to the inherent physical nature of natural gas. Unlike oil, it cannot be produced and stored or transported in railroad cars or tank trucks. A lessee completing a gas well consequently often had a special and quite onerous problem in finding a market outlet for the gas production. This would, at times, result in losing a lease

at the end of the primary term. [Citation omitted.]" *Tucker*, 253 Kan. at 381 (citing *Pray*, 233 Kan. at 353).

And in *Pray* we recognized that, absent a shut-in royalty provision, venture capital to explore for gas in new areas, known as wildcatting, would dry up. "The future supply of gas is dependent upon this risky and expensive business." *Pray*, 233 Kan. at 353.

### FACTUAL AND PROCEDURAL BACKGROUND

*Michael L. Levin and Diane L. Levin*

On June 14, 2006, the Levins leased 128 acres in Miami County to Maw. The lease, drafted by Maw, contained a habendum clause, which stated in pertinent part:

"2.   This is a <u>PAID-UP LEASE</u> and shall remain in force and effect for a term of six (6) months ('Primary Term') from this date and as long thereafter as gas or its constituent products or other hydrocarbons are produced from said land, . . . or as long as LESSEE is conducting operations on said land . . . . If, at the expiration of the Primary Term, gas is not being produced from the premises . . . , but LESSEE is engaged in drilling, reworking or dewatering operations thereon, then this Lease shall continue in full force and effect as long as operations are being continuously prosecuted."

The lease's shut-in royalty clause stated:

"4. If, at any time, while there is a gas well or wells on the above land . . . , and such well or wells are shut in, and if this lease is not continued in force by some other provisions hereof or if a well has been completed and dewatering operations have commenced, then it shall, nevertheless, continue in force as long as said well or wells are shut in and it shall be considered that gas is being produced from the leased premises in paying quantities within the meaning of this lease by the LESSEE paying or tendering to LESSOR annually, in advance a substitute or shut-in gas royalty . . . ."

The Levins and Maw entered into a second lease for the same acreage on December 1, 2006, because the first lease was about to expire with no activity. The lease remained the same, except the primary term in the habendum clause changed from 6 months to "45 days . . . from December 14, 2006." The second lease also included a provision stating: "The shut-in gas period called for in paragraph #4 above shall not exceed one (1) year[] and any one (1) year period in time."

Although the parties do not agree on specific dates, a natural gas well was drilled sometime between February 6, 2007, and February 22, 2007, on the subject acreage.

While the Levins' apparently knew the lease had been assigned, the lessees' joint answer indicates that Maw assigned the Levins' lease to Clary on March 26, 2006. The record on appeal does not appear to support this chronology. It shows the original Levins' lease beginning June 14, 2006, almost 3 months after the alleged assignment. In addition, the Levin acreage is not listed in the March 26, 2006, assignment agreement between Maw and Clary.

Despite these gaps, Clary alleges it tendered shut-in royalty and advance royalty checks to the Levins; and the record shows the Levins received and negotiated a $128 check from Clary on February 22, 2007.

On June 22, 2007, the Levins leased their land to KGE and signed an affidavit of nonproduction.

*James L. Bell and Sheila R. Bell*

On December 6, 2005, the Bells leased 80 acres in Miami County to Maw. The habendum and shut-in royalty clauses in their lease were identical to those in the Levin lease.

Maw assigned the Bells' lease to Clary on March 26, 2006. Although the parties do not agree on specific dates, four natural gas wells were drilled sometime between March 29, 2006, and May 22, 2006, on the subject acreage.

Clary issued the following five checks to the Bells: (1) May 2006, $80 for shut-in royalty; (2) March 14, 2007, $2,000 for advance royalty; (3) April 2007, $80 for shut-in royalty; (4) April 19, 2007, $2,000 for advance royalty; and (5) May 25, 2007, $2,000 for advance royalty. The Bells negotiated the first check.

On March 9, 2007, the Bells leased their land to KGE and filed an affidavit of nonproduction.

*Jeffrey Eidemiller and Diane Eidemiller*

On February 8, 2006, Jeffrey and Diane Eidemiller leased 29.59 acres in Miami County to Maw. While the habendum clause in this lease varied slightly from those in the Levin and Bell leases, the difference is not relevant to the issues before us. The shut-in roy-

alty clause in this lease was identical to those in the Levin and Bell leases. A natural gas well was drilled between February 20, 2006, and March 28, 2006, on the subject acreage.

Maw assigned the lease to Clary on March 26, 2006.

Clary issued the following four checks to Jeffrey and Diane: (1) May 1, 2006, $30 for shut-in royalty; (2) March 14, 2007, $500 for advance royalty; (3) April 19, 2007, $30 for shut-in royalty; (4) April 19, 2007, $500 for advance royalty. Jeffrey and Diane negotiated the first check.

On April 12, 2007, Jeffrey and Diane leased their land to KGE and filed an affidavit of nonproduction.

*Donald R. Eidemiller and Sandra K. Eidemiller*

On November 11, 2005, Donald and Sandra Eidemiller leased 58 acres in Miami County to Maw. Their lease's habendum and shut-in royalty clauses were identical to those in the lease between Jeffrey and Diane Eidemiller and Maw. An addendum to the lease between Donald and Sandra Eidemiller and Maw, dated November 8, 2005, stated:

> "If Lessee does not commence drilling of its first test well for gas purposes somewhere on the South 15.11 acres within 90 days from the date of this lease . . . this lease shall become null and void. If Lessee elects to drill a second gas well, said well will be on the 20 acres directly to the North of the 15.11 acres referred to above. Said second well must be commenced within 6 months of completion [of] the first well drilled on this lease."

The parties signed another amendment on February 10, 2006, which provided for drilling of a third well.

Although the parties do not agree on specific dates, three natural gas wells were drilled sometime between January 25, 2006, and March 7, 2006, on the subject acreage.

Maw assigned the lease to Clary on March 26, 2006.

Clary issued the following checks to Donald and Sandra: (1) May 5, 2006, $58 for advance shut-in royalty; (2) February 8, 2007, $58 for advance shut-in royalty; (3) March 14, 2007, $1,500 for advance royalty; and (4) April 19, 2007, $1,500.00 for advance royalty. The first check was negotiated.

On March 16, 2007, Donald and Sandra leased their land to KGE and filed an affidavit of nonproduction.

*Silver Star Ranch, LLC*

On January 26, 2006, Silver Star leased 42 acres in Miami County to Maw. The Silver Star lease's habendum clause varies slightly from the habendum clauses in other parties' leases, but the difference is not relevant in this case. Silver Star's shut-in royalty clause was identical to those in the other leases at issue.

A natural gas well was drilled between February 28, 2006, and March 3, 2006, on the subject acreage. Drilling for a second gas well began March 16, 2006. This drilling was never completed.

Maw assigned Silver Star's lease to Clary on March 26, 2006.

Clary issued the following four checks to Silver Star: (1) March 2006, $42; (2) March 2007, $820; (3) April 2007, $42; and (4) April 19, 2007, $820. Silver Star negotiated the first check but returned the three other checks.

On May 2, 2007, Silver Star leased its land to KGE and filed an affidavit of nonproduction.

*Robert R. Mazza II and Carol M. Mazza*

On March 16, 2006, the Mazzas leased 80 acres in Miami County to Maw. Their lease's habendum clause was identical to Silver Star's habendum clause. According to the record on appeal, the shut-in clause appears to be identical in pertinent part to those in the other leases at issue.

Maw assigned the Mazzas' lease to Clary on March 26, 2006. Three natural gas wells were drilled between April 14, 2006, and July 21, 2006 on the subject acreage.

Clary issued the following four checks to the Mazzas: (1) March 2006, $80; (2) March 14, 2007, $1,500 for advance royalty; (3) April 19, 2007, $1,500 for advance royalty; and (4) May 25, 2007, $1,500 for advance royalty. The Mazzas negotiated the first check.

On June 25, 2007, the Mazzas leased their land to KGE and signed an affidavit of nonproduction.

*District Court Proceedings*

Each of the sets of landowners described above joined with KGE

and filed a separate verified petition to quiet title against Maw and Clary.

The answers filed by Maw and Clary admitted that no pipe had been laid to deliver gas to a gathering system and that the wells had neither produced nor led to sale of any natural gas. Maw and Clary also filed counterclaims, alleging KGE tortiously interfered with their leases with the landowners.

Before discovery began, the landowners filed motions for summary judgment. They argued that the leases had expired and asserted that it was uncontroverted that no completion activities had been undertaken to allow the wells to produce and deliver natural gas to commercial markets. According to their memoranda in support of their motions, the wells had had no production; no natural gas had been marketed; Maw and Clary had not dewatered the wells; Maw and Clary had not constructed a pipeline to allow access to a gathering system; and Maw and Clary had not constructed a gathering system to allow transport of gas. Under these circumstances, the landowners argued that they were entitled to summary judgment in their favor because the leases' primary terms had expired under the plain language of the habendum clauses requiring actual production, and the shut-in royalty clauses were not triggered because the wells were not capable of producing natural gas in paying quantities even though a market existed to sell the natural gas. The landowners also asserted that discovery was not necessary.

Maw and Clary responded jointly to the motions, purporting to controvert the landowners' facts and contending they had already rebutted the allegations in their answers. Maw and Clary pointed to the shut-in royalty clauses, arguing Clary's payment or tender of shut-in royalties had served as constructive production to maintain the leases. Maw and Clary provided an affidavit from John H. Land, president of Clary, which included the following:

"3. Clary has expended approximately $25,000.00 to drill each of the wells that have been described . . . . Clary has expended additional sums in attempting to remedy surface damage issues that, in many cases, had been ignored by the prior contract operator, and believes that everything has been done, consistent with industry standards, to prepare these wells for the production once a pipeline

connection can be established. I believe that these wells are certainly capable of producing gas on a commercial basis.

"4. One of my primary job responsibilities with Clary . . . has been to develop a market for this gas. For many months we waited for a proposal from Riverdale Pipeline, which delay forced Clary . . . to develop an alternative market for the gas that can be produced by these wells.

"5. We have diligently attempted to develop an alternative market for this gas, designed a gathering system, and made arrangements to obtain financing. Those activities have been frustrated and delayed by the filing of these lawsuits.

"6. . . . I believe that Clary . . . has drilled wells within the primary term of each lease, and tendered shut-in payments in a timely [manner] that would extend the term of these gas leases."

Maw and Clary further argued that summary judgment was inappropriate because discovery had not yet taken place.

The district judge issued his decision, first consolidating the cases and then determining that Land's affidavit was inadequate to controvert the fact that the wells required several improvements, including "a dewatering system, pipelines to a gathering system, and a gathering system," before they could produce natural gas. The district judge noted: "[Land] opines that the wells are 'certainly capable of producing gas in paying quantities.' [Land] does not dispute the allegation that these mechanical or engineering improvements are necessary before any gas can be produced whatsoever." The judge acknowledged that the term "shut-in wells" was not defined by the leases and then quoted *Norman v. Apache Corp.*, 19 F.3d 1017, 1027 (5th Cir. 1994):

" '[S]hut-in' is a generic term used to refer to the closing of the [valves] through which oil and gas flow through a well, its legal meaning refers to the closing of [valves] 'when production at a well capable of producing in paying quantities is temporarily halted to repair or clean the well, to allow reservoir pressure to build, or for a lack of market.' "

He also quoted 8 Williams and Meyers, Manual of Oil and Gas Terms, p. 973 (2006), which described a "shut-in well" as "a producing well that has been closed down temporarily for repairs, cleaning out, building up pressure, lack of market, etc."

Each of these definitions from the district judge's sources rested on the temporary nature of production cessation in a well that had earlier been producing. The judge ruled that Kansas law would

require a well to be capable of producing in paying quantities to trigger a shut-in royalty clause and extend the primary term of a gas lease. He thus framed the issue before him as: "Does the word 'capable' within the phrase 'capable of producing in paying quantities' require that a well be capable of production without any additional equipment?" Although Kansas cases had never defined the term "capable," the district judge relied on two Texas cases—*Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 557-58 (Tex. 2002), and *Hydrocarbon Mgt. v. Tracker Exploration,* 861 S.W.2d 427, 433 (Tex. App. 1993)—to rule that a gas well is capable of producing in paying quantities if it does not require additional equipment or repairs. The judge regarded this definition as consistent with Kansas law and this court's previous decisions.

The district judge continued: "The wording of [the shut-in royalty clause] is at best confusing and ambiguous and at worse nonsensical. The lease requires as conditions precedent that a well be both 'shut-in' and completed with a dewatering operation to have commenced." Because it was uncontroverted that dewatering operations had not begun and thus the well was not capable of producing in paying quantities, the district judge granted the summary judgment sought by the landowners and dismissed the counterclaims.

*Appeal*

This appeal by Maw and Clary was transferred from the Court of Appeals. In addition to the parties' briefs, we have received and reviewed an *amicus* brief from Dart Energy Corporation and a joint *amici* brief from the Eastern Kansas Royalty Owners Association and the Southwest Kansas Royalty Owners Association. The landowners submitted a brief responding to *amicus* Dart Energy Corporation.

## STANDARD OF REVIEW

It has long been established:

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all

facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" ' " *Troutman v. Curtis*, 286 Kan. 452, 454-55, 185 P.3d 930 (2008) (quoting *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 [2007]).

Furthermore, K.S.A. 2009 Supp. 60-256(f) provides the district court with discretion to deny a motion for summary judgment when discovery is needed. See *Troutman*, 286 Kan. at 458-59. An appellate court's "standard of review of such a district court decision is for abuse of discretion." *Troutman*, 286 Kan. at 459.

The summary judgment before us involves the interpretation and legal effect of a written instrument. These are matters of law, and an appellate court exercises unlimited review of a district judge's decision on the content and consequences of a written contract. *City of Arkansas City v. Bruton*, 284 Kan. 815, 828-29, 166 P.3d 992 (2007). "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007).

"An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]" *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000).

### DEFINITION AND APPLICATION OF SHUT-IN ROYALTY CLAUSES

The leases involved in this case contain typical habendum clauses; each clause contained a primary term, which varied by landowner, and a thereafter provision extending the lease as long as gas or its constituent products or other hydrocarbons were being produced. In other words, to continue the leases under the thereafter provisions in the habendum clauses, lessees were required to

produce gas in paying quantities during the primary terms. Because they admitted in their answers that they did not actually do so, any extension of the leases therefore became dependent on application of the shut-in royalty clauses to establish constructive production.

We disagree with the district judge's harsh assessment that the shut-in royalty clauses before us are "at best confusing and ambiguous and at worst nonsensical." We also disagree on the game-changing significance of dewatering operations; it was a possible step but not an indispensable step before the shut-in royalty clauses could come into play.

Although the shut-in royalty clauses certainly are more wordy than might be strictly necessary, they nevertheless unambiguously set up three conditions for their application to perpetuate the leases. The first condition is the existence of a gas well or wells on the subject land. The parties do not dispute that this condition is satisfied under the facts before us. The second condition is that the well or wells be shut-in; whether the subject wells qualify as shut-in is a hotly contested question. The third condition may be satisfied by one of two fact patterns: Either the leases must not be continued in force by some other lease provision or the well or wells must be "completed" and dewatering operations commenced. There is no dispute that dewatering operations have not begun; thus, if the third condition is satisfied, it must be because the first alternative is satisfied, *i.e.*, the term of the leases cannot have been extended by a provision other than the shut-in royalty clauses. There is no dispute between the parties on the satisfaction of this alternative. If, and only if, the three conditions are satisfied, the payment of shut-in royalties, such as those paid or tendered here, must occur to extend the term of the leases.

We thus must examine the second condition, *i.e.*, whether the wells qualify as shut-in. Once a legal definition for this term is established, we regard the issue of whether the subject wells satisfied the definition as a fact question. In this appeal, the devil is in the definition.

The leases before us do not define shut-in. We therefore turn to case law to fill in what the parties did not tell us. Several previous Kansas Supreme Court cases assist us.

In *Dewell v. Federal Land Bank*, 191 Kan. 258, 380 P.2d 379 (1963), this court ruled on a dispute involving whether the term of a mineral rights reservation in a warranty deed between a seller and a purchaser that required actual production could be extended by payment or tender of shut-in royalties creating constructive production under a subsequent oil and gas lease entered into by the purchaser's successor and a lessee. The answer was no. *Dewell*, 191 Kan. at 263; see also *Classen v. Federal Land Bank of Wichita*, 228 Kan. 426, 432, 617 P.2d 1255 (1980) (restating this as issue of *Dewell*); *Friesen v. Federal Land Bank of Wichita*, 227 Kan. 522, 526-28, 608 P.2d 915 (1980) (Herd, J., dissenting) (recognizing this as true holding of *Dewell*, in contrast to expanded mischaracterizations in subsequent cases having to do with production from different tracts within pooled or unitized area).

In *Dewell*, the reservation's initial term was 20 years—from May 13, 1939, until May 13, 1959—which would be extended " 'so long thereafter as oil, gas and/or other minerals or any of them are produced therefrom, or the premises are being developed or operated.' " *Dewell*, 191 Kan. at 258-59. A 10-year oil and gas lease executed in September 1947 by the landowner was extended by operation of the lease's shut-in royalty clause when drilling ended in September 1957, "on which date the well was *completed* as a gas well *capable of producing* natural gas in paying quantities," and annual royalties were paid by the lessee. (Emphasis added.) *Dewell*, 191 Kan. at 259. The gas well "completed" in September 1957 was "*shut-in* and not connected to a pipeline" until January 1960. (Emphasis added.) *Dewell*, 191 Kan. at 260. We stated:

> "The shut-in royalty clause contained in the leases was for the sole benefit of the lessee. It is a privilege granted the lessee in lieu of production. It does not purport to convey any estate or rights to anyone else. Neither does it purport to extend the interest of the holders of the mineral rights.
>
> . . . .
>
> "The provision in the lease executed by [landowner], to which the reversioner was not a party, for payment of shut-in royalty[,] does not constitute an agreement by the reversioner to extend the term of the mineral grant nor make the payment of shut-in royalties the equivalent of production." *Dewell*, 191 Kan. at 261-62.

Our court agreed with a Texas decision in which the court distinguished between a well *capable of producing, i.e.,* the type of

well that activated the shut-in royalty clause in the lease, and a well *actually producing, i.e.*, the type of well necessary to continue the reservation of mineral rights under the warranty deed. *Dewell*, 191 Kan. at 263 (quoting *Sellers v. Breidenbach*, 300 S.W.2d 178, 179 [Tex. Civ. App. (1957)]). Because the well in question was only the former and not the latter before the May 1959 expiration of the 20-year primary term of the reservation, the reservation was not extended. *Dewell*, 191 Kan. at 263.

*Dewell* is significant to the question before us because it implicitly defines shut-in. A well is shut-in when it is completed and capable of producing natural gas in paying quantities. The well in *Dewell* qualified as soon as drilling was completed in September 1957, even though the well was not connected to a pipeline until more than 3 years later.

The second of our earlier helpful cases was *Martin v. Kostner*, 231 Kan. 315, 644 P.2d 430 (1982). In that case, lessees sued to quiet their title to certain oil and gas leasehold estates, and the district judge's ruling in their favor was upheld on appeal. In order to do so, the court examined whether activity on the subject property had been sufficient and timely under an exceptionally straightforward shut-in royalty clause. It read:

" '[A]t any time, either before or after the expiration of the primary term of this lease, if there is a gas well or wells on the above land . . . and such well or wells are shut in before or after production therefrom, lessee or any assignee hereunder may pay or tender annually at the end of each yearly period during which such gas well or gas wells are shut in, as substitute gas royalty, a sum equal to the amount of delay rentals provided for in this lease for the acreage then held under this lease by the party making such payments or tenders, and if such payments or tenders are made it shall be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities.' " *Martin*, 231 Kan. at 317.

The subject leases were executed on November 6, 1975, for a primary term of 3 years, with conventional habendum clauses allowing continuance of the leases " 'as long thereafter as oil, liquid hydrocarbons, gas or other respective constituent products, or any of them, is produced from said land or land with which said land is pooled.' " *Martin*, 231 Kan. at 315. In July 1978, *i.e.*, within the

primary term, drilling on one tract began, and, on September 1, 1978, "the well was *completed and shut in awaiting hookup*" with a gas line. (Emphasis added.) *Martin*, 231 Kan. at 316. The well was not hooked up to the pipeline until late December 1978 and not turned on until January 3, 1979, *i.e.*, beyond the primary term of the leases. Within a few days, the well began producing. The next month, drilling began on second tract, which is when the parties' dispute arose.

Among other arguments, the landowners argued that the lessees' failure to tender or pay shut-in royalties before the expiration of the leases' primary term doomed its continuation. Our court agreed with the district judge that, under the shut-in royalty clause, the 1-year period for remittance of payment did not begin until a well "capable of producing gas" was "completed," which had occurred on September 1, 1978. *Martin*, 231 Kan. at 317. Although later language in the opinion also indicates that the fact the well had been placed "in production" within 1 year of the expiration of the primary lease term was significant to our court's analysis and outcome, see *Martin*, 231 Kan. at 317, this language contradicts the shut-in clause at issue, and we hereby disavow it. The clause before us in *Martin* plainly required only that the shut-in royalty be tendered or paid at the end of the year after the expiration of the primary term and annually thereafter, *regardless* of whether actual production had ever been begun before the well was shut in during the primary term. The clause said nothing about the significance or lack of significance of production that started after the primary term expired.

Again, as with *Dewell*, the significance of *Martin* to this case is its implicit definition of shut-in. The well was "capable of producing gas" and "completed," *i.e.*, shut-in on September 1, 1978. It was not necessary either that it be hooked up to a pipeline or turned on before it qualified as shut-in and activated the shut-in royalty clause.

The third case offering some guidance on the definition of shut-in to be applied in this case was decided in 1983: *Pray v. Premier Petroleum, Inc.*, 233 Kan. 351, 662 P.2d 255 (1983). In that case, a landowner was able to quiet title in the district court for lack of

production after a lessee drilled a well on leased acreage. The well was the only one in its area and was 3 miles from the nearest gas pipeline. The lessee invoked the lease's shut-in royalty clause in its effort to extend the term of the lease under the habendum clause.

This court first observed that shut-in royalty clauses can provide a remedy for a situation in which no market is available by the end of the primary term of a gas lease.

"Even though the construction of a shut-in royalty clause depends on the specific terms of the lease in question, certain general characteristics of shut-in royalty clauses should be noted.

"First, such clauses actually modify the lease's habendum clause to provide for a type of 'constructive production.' [Citation omitted.]. . . .

"Second, [such clauses work for benefit of both parties]. . . . [T]he implied covenant to reasonably develop the leasehold is applicable. [Citation omitted.] Here, however, the complaint against the lessee is not for breach of these provisions. In fact, the evidence indicates the lessee diligently searched for a market.

"Finally, although the shut-in royalty clause does not normally specify the shut-in gas well must be capable of producing in paying quantities, such a requirement is implied. As noted, the shut-in royalty clause is a savings clause allowing for constructive production. Such clauses provide that upon payment of the shut-in royalty it will be considered gas is being produced within the meaning of the habendum clause. In order to achieve the desired result, namely a profit, production, whether actual or constructive, must be in paying quantities. [Citation omitted.]" *Pray,* 233 Kan. at 353-54.

In *Pray,* the operative shut-in royalty clause in the lease was simple. It required only (1) that there be a well where only gas was found and (2) that such gas not be sold or used. If these two conditions were met, the lessee would be permitted to extend the lease by paying shut-in royalties. The specific question before this court in *Pray* was whether the cost of connecting the lonely subject gas well to a pipeline should be part of the calculation to determine whether the implied requirement that any production be "in paying quantities." *Pray,* 233 Kan. at 356. This court decided that the cost of the pipeline should not be so considered:

"Involved here is precisely the type of situation contemplated by the clause—a well capable of producing a profit is drilled but for the time being no market exists. This is much different from cases . . . where no shut-in royalty clause is involved and a determination of production in paying quantities can be made simply by looking at the performance of the well. [Citation omitted.] A case such

as the one at bar, on the other hand, necessarily involves some speculation. This speculation should not include the cost of taking the gas to market when the parties have foreseen in the lease the possibility a market might not exist.

"We hold capital expenditures for building a pipeline are improper considerations for determining whether a gas well will produce in paying quantities under a shut-in royalty clause." *Pray*, 233 Kan. at 356-57.

*Pray*, although it focused its attention on the contours of "in paying quantities," again implicitly defined a shut-in well as one that had been drilled but not connected to the facilities necessary to market or transport any gas produced.

The fourth of our helpful previous cases discussing shut-in royalty clauses was *Robbins v. Chevron U.S.A., Inc.*, 246 Kan. 125, 785 P.2d 1010 (1990). *Robbins* primarily concerned the proof necessary to avoid summary judgment on an action for breach of an oil and gas lessee's implied covenant to produce and market production reasonably and diligently. It differed from the previous cases because producing wells had been shut in when a dispute about price arose rather than never activated or turned on. Lessee Chevron timely tendered shut-in royalty payments under a clear clause in the lease. The importance of *Robbins* to this case is the distinction it emphasizes between a claim for violation of the implied covenant, which entitles a lessor to damages, and a claim for violation of a shut-in royalty clause, which entitles a lessor to cancellation of the lease. As *Pray* had observed, " '[t]he fact a lease is held by payment of shut-in royalties does not excuse the lessee from his duty to diligently search for a market and reasonably develop the leasehold.' " *Robbins*, 246 Kan. at 135 (quoting *Pray*, 233 Kan. 351, Syl. ¶ 3.

The distinction on which *Robbins* focuses also bears emphasis here. To the extent the landowners in this case argue with Maw and Clary because of a failure to develop and maximize any market advantage or position, and to the extent Land's affidavit contests landowners' view on that subject, this case involves the covenant to produce and market reasonably and diligently. Any alleged or actual breach of that covenant should not be confused with a claim that the shut-in royalty clause did not apply or, if it applied, was not met.

The last potentially relevant shut-in royalty case from our court was decided in 1993. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 855 P.2d 929 (1993). *Tucker* involved certain landowners' efforts to terminate leases whose wells required particularly challenging maintenance. As in *Robbins*, the wells had been producing, but the lessees allowed them to be shut down for several years while the cost of their maintenance was not, at least in their view, justified by the revenue stream the wells generated. Meanwhile, the lessees paid shut-in royalties to the landowners.

As in *Pray*, the language of the shut-in royalty clauses at issue was relatively simple. It required (a) that the well or wells be capable of producing gas only and (2) that the gas not be sold or used for a period of 1 year. If shut-in royalties were paid or tendered, the leases would be regarded as producing under the leases' habendum clauses.

This court held that the shut-in royalty clauses and payments did not save the leases, when the district court found that there was a limited market for the gas from the wells and the lessees chose to stop producing because the wells required constant work. The court's discussion appears to focus alternately on both the shut-in royalty clauses and the covenant to produce and market. *Tucker*, 253 Kan. at 378-82.

Although *Tucker* asserts that the total absence of a market for natural gas is a prerequisite to classify a well as shut-in and thus bring into play a shut-in royalty clause, this assertion appears to arise out of an overinterpretation of *Pray* and insufficient attention to the subject leases' language. The presence or absence of a market and its prospects for a lessee's ability to turn a profit may be made pertinent to interpretation and application of a shut-in royalty clause because of the lease's language, but it is not inevitably relevant as a matter of law. In other words, *Pray* did not make the absence of a market a part of Kansas' definition of "shut-in." Such a consideration is, on the other hand, indispensable to analysis of whether a lessee has discharged its duty under the covenant to produce and market. That covenant is not before us here.

We see more useful guidance in the Court of Appeals' December 2009 decision in *Welsch v. Trivestco Energy Co.*, 43 Kan. App.

2d 16, 221 P.3d 609 (2009). In *Welsch,* the lessee's successor, Trivestco, had failed to pay or tender any shut-in royalties during the 2½ years that actual production from the lease's well was stopped because of the gas purchaser's financial problems. Trivestco also did not attempt to restart production from the well or to drill elsewhere on the lease after the 2½ years passed. The district judge refused to grant summary judgment cancelling the subject lease, ruling that the lease's shut-in royalty clause created a covenant entitling the lessor and any successor to money damages rather than a condition entitling the lessor and any successor to termination. The Court of Appeals panel disagreed, reversing and remanding with directions to cancel the lease. *Welsch,* 43 Kan. App. 2d at 18, 29.

The panel observed the critical importance of lease language:

"First, we note that the [shut-in royalty provisions of the subject lease] are not a part of the habendum clause but rather are contained within the royalty clause. Second, we note that the provisions are stated in language indicating that such payments are optional; that is, the lease provides that the lessee 'may' pay or tender such royalties rather than employing language of obligation. Third, we note that the provisions contain the saving clause that if such royalties are paid, 'it shall be considered under all provisions of this lease that gas is being produced from the leased premises in paying quantities'; that is, payment of such royalties—if elected by the lessee—is obviously intended to relate to the habendum clause that preserves the lease in effect 'as long thereafter as' production is achieved. Finally, we note that production from the lease was achieved during the primary term, and its cessation occurred well into the secondary term of the lease, where the habendum clause required production for the term of the lease to continue. These unique features of the shut-in royalty provisions are paramount to our construction and application of those provisions to the factual circumstances here.

"Generally, reliable authorities recognize that an option to pay shut-in gas royalties—in contrast to an obligation to do so—can support cancellation where the optional royalties are not paid. Generally, such an option is considered to create a special limitation on the lease, and the failure to pay the shut-in royalties will terminate the lease. [Citation omitted.] . . .

. . . .

". . . [H]ere the lease does provide 'by implication' that it will expire absent such payment. In stating that 'if such payments or tenders are made it shall be considered under all provisions of this lease that gas is being produced,' the lease implies that if such payments are not made, the production requirement of the habendum clause is not satisfied by reason of the shut-in well. In the absence of

production in paying quantities, the lease expires by its own terms." *Welsch*, 43 Kan. App. 2d at 22-23.

Compare *Daniels v. Quest Cherokee*, 2009 WL 5062371 (Kan. App. 2009) (unpublished opinion) (decided same day by same panel as *Welsch*; interpreting stand-alone mandatory shut-in royalties clause with no reference to habendum clause to be covenant rather than condition).

A synthesis of these earlier cases from our court and the Court of Appeals makes it evident that a well generally qualifies as shut-in under Kansas law when it is physically complete and capable of producing in paying quantities, even if it has not actually produced in paying quantities in the past. The fact that it has not yet been connected to a pipeline does not necessarily make it incomplete or prevent it from being accurately described as shut-in. The setup and performance of dewatering operations may affect a well's completeness, but we decline the lessors' invitation to adopt a rigid legal definition of shut-in entirely dependent upon whether dewatering has begun or upon whether equipment or repairs are still needed. See *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 557-58 (Tex. 2002); *Hydrocarbon Mgt. v. Tracker Exploration*, 861 S.W.2d 427, 433 (Tex. App. 1993). Under Kansas case law and in the absence of a lease provision to the contrary, the factors to be considered by the factfinder in determining whether a well is physically complete and capable of producing in paying quantities, *i.e.*, shut-in, are those that affect the properties and potential of the well itself, rather than the likely success of any processing or transport of product that remains to be attempted or accomplished. Other factors, such as comparisons to marketing efforts pursued for minerals produced on neighboring leases, on the other hand, are not relevant. They go to the entirely different legal theory— whether damages are due for breach of the covenant to produce and market production reasonably and diligently—that is not before us here. Today we look only at a claim that the subject oil and gas leases should be cancelled for failure to extend their terms through compliance with their shut-in royalty clauses.

As we have stated, the question of whether the wells at issue in this consolidated case qualified as shut-in, defined as it must be

when the leases are silent purely by our synthesis from case law, is one of fact. Although a future case may arise on a record in which the uncontroverted evidence makes the correct finding of fact inescapable, this is not such a case. This case must therefore be reversed and remanded with directions to vacate the summary judgment in favor of landowners and to permit further proceedings, including, as the parties and the district judge deem necessary, discovery and the development of expert testimony. The question to be answered by the trier of fact is whether the subject wells were physically complete and capable of producing in paying quantities.

Because the analysis and discussion above are dispositive, we do not reach lessees' other arguments in favor of reversal of the district court's decision.

Reversed and remanded to district court with directions to vacate the summary judgment in favor of the landowners and conduct further proceedings.

McFARLAND, C.J., not participating.
DANIEL L. LOVE, District Judge, assigned.